UNITED STATES, Appellee

v.

Shannah L. HENSLER, Lieutenant
Commander U.S. Navy,
Appellant.

No. 95–0140.
CMR No. 92–0485.

U.S. Court of Appeals for
the Armed Forces.

Argued Nov. 2, 1995.

Decided July 12, 1996.

For Appellant: *Lieutenant Commander Eric C. Price, JAGC, USN* (argued); *Lieutenant Kent Tester, JAGC, USNR* (on brief).

For Appellee: *Lieutenant Jonathan W. Haray, JAGC, USNR* (argued); *Commander D.H. Myers, JAGC, USN* and *Lieutenant S.J. Coaty, JAGC, USNR* (on brief); *Colonel J. Composto, USMC, Major A. Diaz, USMC, Lieutenant R.W. Sardegna, JAGC, USNR, Lieutenant John R. Livingston, Jr., JAGC, USN.*

*Opinion of the Court*

GIERKE, Judge:

A general court-martial composed of officers convicted appellant, contrary to her pleas, of conduct unbecoming an officer (4 specifications) and fraternization (2 specifications), in violation of Articles 133 and 134, Uniform Code of Military Justice, 10 USC §§ 933 and 934, respectively. The adjudged and approved sentence provides for dismissal from the service. The Court of Military Review * affirmed. 40 MJ 892 (1994).

Our Court granted review of the following issue:

> WHETHER THE LOWER COURT ERRED WHEN IT FOUND THAT APPELLANT WAS NOT ENTITLED TO AN INSTRUCTION ON INVOLUNTARY INTOXICATION.

*Background*

Appellant was assigned to the Navy Recruiting District, Pittsburgh, Pennsylvania, as executive officer. Before her arrival, the district commander tried to have her orders changed, because she was a single parent of an infant and, as executive officer of a recruiting district, she would not have access to Navy support facilities such as medical care and day care facilities.

Appellant arranged for her mother to care for the baby. Because of her commander's efforts to change her assignment, she believed that he did not want her as a member of the command. Appellant nevertheless reported for duty in May 1990 and became executive officer in July 1990.

During the last week in June 1990, appellant and several members of her command went to a local bar in uniform. After 4–5

hours of drinking, she and Aviation Electronics Technician Chief (ATC) Hoerr (then a first class petty officer) left the bar. While waiting for a traffic light to change, they kissed. ATC Hoerr testified that he did not remember who initiated the kiss. Appellant invited ATC Hoerr into her apartment, where they engaged in sexual intercourse on the living room floor.

Storekeeper First Class (SK1) Scerba testified that he and several members of the command went to a bar with appellant on the first Friday in July 1990. SK1 Scerba was in uniform and appellant was in civilian clothes. Appellant, SK1 Scerba, and a female petty officer went to another bar at about 7:00 p.m. and continued drinking for another 2–3 hours. Appellant consumed "about five glasses of wine."

SK1 Scerba and appellant went to a third bar, where Scerba drank a bottle of beer and appellant had a glass of water. They then walked to appellant's apartment. SK1 Scerba testified that he did not remember whether appellant invited him into the apartment. Once inside, SK1 Scerba massaged appellant's neck and shoulders. She removed all her clothing "so that [Scerba] could continue the massage." SK1 Scerba testified that he started "to perform oral sex on her," and appellant suggested that they go to the bedroom. There they engaged in sexual intercourse that night and again in the morning. SK1 Scerba testified that in the morning, appellant told him, "I better not go drinking with the guys anymore, after work anymore.... Last week it was Petty Officer Hoerr; this week it's you." When SK1 Scerba asked appellant if she slept with ATC Hoerr, she replied, "Yeah, I guess so. We woke up together."

SK1 Scerba further testified that appellant called him a couple of weeks later. They went to dinner and then to a bar, where appellant had two glasses of wine, and then returned to appellant's apartment. SK1 Scerba testified that he was sitting on the sofa when appellant "approached me and straddled me and sat on my lap." She then removed her clothing. They went into the

* *See* 41 MJ 213, 229 n. * (1994).

bedroom, engaged in sexual intercourse, and fell asleep. SK1 Scerba testified that in the morning, appellant performed fellatio on him.

Personnelman First Class (PN1) Nicklas testified that he went to a command celebration in late September 1990 at a local bar. PN1 Nicklas testified that, while in uniform, appellant put her hands on his hips and kissed him on the cheek. He responded by telling her that her conduct was improper. Later, while they were traveling in a car from one bar to another, appellant put her hand on his leg and again kissed him. He again told her that her conduct was improper, and she desisted.

ATC Hoerr further testified that in late September the command went to a bar to celebrate "a real good recruiting year." Both he and appellant were in "dress whites." While at the bar, appellant began rubbing his leg. They later went to a friend's apartment, where appellant again fondled his leg. ATC Hoerr testified that he "kept pushing her hand away" because "it was kind of embarrassing, actually"; "there were people around." Appellant then started kissing him on his neck and straddled him. After everyone else had gone to sleep or "passed out," appellant and ATC Hoerr fondled each other and then went to sleep on the floor.

The following morning ATC Hoerr took appellant back to her apartment. Appellant invited him into the apartment. They began kissing in the kitchen, went into the bedroom, completely undressed, had sexual intercourse, and then appellant performed fellatio on him. As ATC Hoerr was leaving the apartment, appellant told him not to mention what had happened.

PN1 LaDuke testified that he accompanied appellant on a training and inspection trip in October 1990. At the end of the first work day, appellant, PN1 LaDuke, and a senior chief petty officer went to the bar at their hotel. They remained at the bar from 6:30 p.m. until about 1:00 a.m. PN1 LaDuke testified that he offered to walk appellant to her room.

LaDuke testified that he "made a pass" at appellant "to find out if the rumors that I

heard were true." He went into appellant's room with her and twice attempted to kiss her. Both times she turned away and said, "No." On the third attempt, appellant lay back on the bed and "didn't give any resistance." LaDuke undressed her, then undressed himself and started to kiss her. He testified that "at that point I realized that I was doing something that I shouldn't be doing and I stopped." He dressed, waited for awhile "in case she was going to get sick or anything like that," and then left. The next morning appellant asked LaDuke what had happened the night before, and he told her "that nothing actually happened; that, you know—got drunk and I made some passes at her, undressed her, but we didn't do anything."

The defense case focused on expert testimony regarding appellant's mental state at the time of the offenses. Lieutenant Tamargo, a clinical psychologist intern, diagnosed appellant as having a number of personality disorders. LCDR Boehme, M.D., chief neurology resident at Bethesda Naval Hospital, testified that appellant suffered from migraine headaches and was taking a dangerous and unusual combination of drugs: Bellergal, Prozac, and Darvocet. In his opinion, it was "likely" that appellant "suffered from a severe mental disease or defect, as a result of the alcohol and the medications."

Dr. Bruce Smoller, a civilian psychiatrist, testified that appellant's alcohol consumption in combination with her medications could "produce a loss of sensorium." In his opinion, appellant "has serious psychological problems." He diagnosed appellant as having a "personality disorder" that could have been transmitted from her mother or caused by sexual abuse and maternal neglect during childhood. Dr. Smoller testified that appellant "had a history of hepatitis." He diagnosed appellant as suffering from "organic brain syndrome" that is a "dementia." In Dr. Smoller's opinion, appellant did not appreciate the wrongfulness of her acts at the time of the six offenses charged.

The Government countered with other experts who opined that appellant had the ability to appreciate the nature and quality or the

wrongfulness of her acts. The government experts agreed that appellant suffered from some psychological impairment and that drugs and alcohol had distorted her judgment. 40 MJ at 895.

In closing arguments, trial counsel focused on the defense contention that appellant lacked mental responsibility because of "a confluence of her drugs, her personality traits, her depression, and the introduction of alcohol." Trial counsel argued: "Voluntary intoxication is not a defense. The flip side of that coin, however, is involuntary intoxication can be a defense." Trial counsel conceded it was possible "that the very first time, towards the end of June or early July, when she was out with Petty Officer Hoerr and others, that she did not have notice that as a result of drinking heavily, taking Prozac, Darvocet and Bellergal, she would end up in a state where she could not appreciate the nature or wrongfulness of her actions." Trial counsel argued, however, that after the first incident, involuntary intoxication was not available as a defense. On the other hand, defense counsel argued that appellant was unable to appreciate the wrongfulness of her conduct at any of the six times charged.

The military judge instructed the members: "An issue before you is the accused's sanity at the time of the offenses." He defined mental responsibility. He advised the members "that the term, 'severe mental disease or defect' can be no better defined in the law than by the use of those terms themselves."

He used the term "involuntary intoxication" with respect to the issue whether appellant "knew that she was fraternizing with enlisted personnel." He instructed the members that "alcoholism and chemical dependency is recognized by the medical profession as a disease involving a compulsion towards intoxication." He did not specifically link the term "involuntary intoxication" with lack of mental responsibility.

### Discussion

■ Voluntary intoxication is not a defense to a general-intent crime, but it may raise a reasonable doubt about actual knowledge, specific intent, willfulness, or premedi-

tation when they are elements of a charged offense. *See* RCM 916(*l*)(2), Manual for Courts–Martial, United States (1995 ed.); *see also United States v. Hernandez,* 20 USCMA 219, 223, 43 CMR 59, 63 (1970) ("It is the voluntary nature of the intoxication that cause us to hesitate about adopting the rule urged by appellate defense counsel."). While our Court has rejected voluntary intoxication as a defense, we have not expressly ruled on involuntary or "pathological intoxication" as a defense. *See United States v. Santiago–Vargas,* 5 MJ 41, 42–43 (CMA 1978) ("Assuming, without deciding, that the condition [pathological intoxication] can properly be recognized in military law, the appellant does not come within its scope. . . .").

■ At common law involuntary intoxication was a defense to a general-intent crime. R. Perkins and R. Boyce, *Criminal Law* (hereafter Perkins) 1001 (3d ed. 1982). It rises to the level of an affirmative defense, however, only if it amounts to legal insanity. *See United States v. F.D.L.,* 836 F.2d 1113, 1116 (8th Cir.1988) ("[T]he mental state of an involuntarily intoxicated defendant is measured by the test of legal insanity."); *see also* § 2.08(4), ALI Model Penal Code, *reprinted in* ALI *Model Penal Code and Commentaries* (hereafter *Commentaries* ) (Part I) 349 (1985); 2 *Wharton's Criminal Law* § 113 at 126 (C. Tortia 15th ed.); Perkins, *supra,* at 1005; Annotation, *When Intoxication Deemed Involuntary so as to Constitute a Defense to Criminal Charge,* 73 ALR 3d 195, 199 (1976). The defense is not available if an accused is aware of his or her reduced tolerance for alcohol but chooses to consume alcohol anyway. *Kane v. United States,* 399 F.2d 730, 735–36 (9th Cir.1968), *cert. denied,* 393 U.S. 1057, 89 S.Ct. 698, 21 L.Ed.2d 699 (1969); § 2.08(5)(b), *Commentaries, supra* at 349; 73 ALR 3d at 203.

■ The military judge has an affirmative duty to instruct on all special defenses that are "reasonably raised by the evidence." *United States v. Barnes,* 39 MJ 230, 232 (CMA 1994); RCM 920(e)(3). The court below recognized the defense of involuntary intoxication but held that it was not raised by

the evidence. 40 MJ at 897, 898. *See also United States v. Ward,* 14 MJ 950, 953 (ACMR 1982) (recognizing involuntary intoxication as a defense when the substance consumed is not illegal), *pet. denied,* 16 MJ 94 (1983).

We disagree with the court below that involuntary intoxication was not raised as to the first episode of drinking and fraternization that occurred in late June of 1990 with ATC Hoerr (specification 3 of the Charge). We agree with the court below, however, that the defense was not raised as to the remaining five episodes because appellant was on notice that she reacted inappropriately to consumption of alcohol. She admitted as much to SK1 Scerba when she told him, "I better not go drinking with the guys anymore.... Last week it was Petty Officer Hoerr; this week it's you."

We also reject appellant's argument that the military judge failed to instruct on her defense. He correctly instructed on the special defense asserted: lack of mental responsibility. *See* RCM 916(k)(1). His instructions were consistent with the defense theory.

The question remains whether the military judge adequately instructed the members regarding involuntary intoxication. We hold that the instructions were adequate in the absence of a defense request for additional instructions tailored to the evidence. *See United States v. Sanders,* 41 MJ 485, 486–87 (1995) (military judge "does not have an obligation *sua sponte* to instruct on every fact that may support" a defense theory).

Involuntary intoxication is treated like legal insanity. It is defined in terms of lack of mental responsibility. *See United States v. F.D.L.* and Model Penal Code, both *supra.* The military judge told the members that appellant's sanity was an issue for them to decide, and he correctly instructed on the standard for determining mental responsibility. He instructed them that alcoholism and chemical dependency are a "disease." By instructing on mental responsibility, he covered all elements of involuntary intoxication, except the causes of the intoxication, which

were not disputed. By not distinguishing between voluntary and involuntary intoxication, he gratuitously extended the potential defense to all six episodes, even though it was raised only as to the first.

The military judge did not specifically instruct that the combination of appellant's psychological problems, job-related stress, over-medication, loss of liver function due to hepatitis, and consumption of alcohol could cause lack of mental responsibility. The Government did not dispute appellant's contention, however, that this combination of factors could cause a lack of mental responsibility. The only factual dispute in this case concerned appellant's mental state at the time of the offenses. The defense witnesses testified that she was not mentally responsible; the government witnesses testified that her judgment was distorted but she remained mentally responsible. The arguments of both counsel focused on her mental state. The instructions could have been better tailored to the evidence, but we are satisfied, based on this record, that the question of appellant's mental responsibility was fully presented to the members in a correct legal framework.

## Conclusion

We hold that the court below erred by concluding that involuntary intoxication was not raised as to specification 3 of the Charge. We agree with the court below, however, that the military judge's instructions as a whole were correct.

## Decision

The decision of the United States Navy–Marine Corps Court of Military Review is affirmed.

Chief Judge COX, Judge CRAWFORD, and Senior Judge EVERETT concur.

SULLIVAN, Judge (dissenting in part and concurring in the result):

I agree with the majority that the military judge's instructions taken as a whole were sufficient in this case. However, I disagree with the majority opinion when it states: "We disagree with the court below that involuntary intoxication was not raised as to the

first episode of drinking and fraternization that occurred in late June of 1990 with ATC Hoerr (specification 3 of the Charge)." 44 MJ at 188.

Curiously, the majority states no reason for its disagreement with the court below. On this question, I would agree with the court below and its detailed, reasoned analysis of this issue, as follows:

> Even this evidence offers the appellant no support for her claim that an instruction regarding involuntary intoxication was required. The fact remains that, even with regard to the first instance of misbehavior, there is no direct or circumstantial evidence that she was actually unaware of the effects of taking this combination of medications and alcohol. Even the defense psychiatrist, Dr. Smoller, never opined that she was probably or even possibly unaware of the effects of alcohol even in her confused mental and emotional state; nor did he suggest at all that her use of alcohol was other than voluntary in any sense of the word. It is clear that the testimony concerning the possibility or probability that the appellant was initially unaware of the intoxicating effects of the substances in combination was in the nature of a hypothetical discussion of alternative explanations for her behavior. It stands in stark contrast to the evidence supporting the opposite conclusion. First, the Navy psychiatrist who examined her testified to the common practice of warning users of these drugs of the hazards of taking them with alcohol. Record at 306. Second, there is ample circumstantial evidence that she was well aware of her tendency to engage in the charged behavior when she took medication and over indulged in alcohol. Specifically, her comments to Petty Officer S that she should not go "out" with the enlisted men because she tended to end up in bed with them; to Petty Officer H not to tell anyone about what they had done; and to Petty Officer B that it was no one's business whom she saw and that the uniform "didn't matter," all bespeak an awareness of her own behavior and its ramifications. This in turn supports the inference that she knew full well the intoxicating and socially lubricating effects of the substances that prodded her to engage in that behavior. Having such notice, use of these substances cannot be labeled "involuntary." *United States v. Foley*, 12 MJ 826, 829 (NMCMR 1981).

40 MJ 892, 899 (1994) (footnote omitted).

There is a further reason why I do not join the majority opinion in this case. I frankly am uncomfortable with the lengthy and unnecessarily detailed description of appellant's bar life (nine bars) and at least ten sex acts in this case. This is not a case of sufficiency of the proof to establish the charged offenses. This is a simple case of failure to raise a defense, nothing more.