UNITED STATES, Appellee

v.

George D. B. MACDONALD, Private First Class
U.S. Army, Appellant

No. 14-0001

Crim. App. No. 20091118

United States Court of Appeals for the Armed Forces

Argued May 13, 2014

Decided August 27, 2014

BAKER, C.J., delivered the opinion of the Court, in which
ERDMANN, STUCKY, RYAN, and OHLSON, JJ., joined.

Counsel

For Appellant:  William E. Cassara, Esq. (argued); Lieutenant
Colonel Jonathan F. Potter and Captain Robert H. Meek III (on
brief); Captain Brandon H. Iriye.

For Appellee:  Captain Daniel M. Goldberg (argued); Colonel John
P. Carrell, Lieutenant Colonel James L. Varley, and Major
Catherine L. Brantley (on brief); Major Robert Rodrigues.

Military Judge:  James L. Pohl

**THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.**

Chief Judge BAKER delivered the opinion of the Court.

A panel of members sitting as a general court-martial convicted Appellant, contrary to his pleas, of one specification of resisting apprehension in violation of Article 95, Uniform Code of Military Justice (UCMJ), one specification of premeditated murder in violation of Article 118, UCMJ, and two specifications of assault in violation of Article 128, UCMJ. 10 U.S.C. §§ 895, 918, 928 (2012). Appellant was sentenced to a reprimand, reduction to E-1, forfeiture of all pay and allowances, confinement for life without the eligibility of parole, and a dishonorable discharge. The convening authority approved the adjudged sentence. Appellant then appealed to the United States Army Court of Criminal Appeals (CCA), which focused on two issues: (1) whether the military judge erred in quashing Appellant's subpoena request to Pfizer, Inc. (Pfizer) for additional data; and (2) whether the military judge abused his discretion in denying Appellant an instruction on involuntary intoxication. On July 3, 2013, the CCA held that the military judge erred in failing to enforce the subpoena, but the error was harmless beyond a reasonable doubt. United States v. MacDonald, No. ARMY 20091118, 2013 CCA LEXIS 548, at *25, 2013 WL 3376714, at *9 (A. Ct. Crim. App. July 3, 2013) (unpublished). The CCA also concluded the military judge abused his discretion in refusing to issue the involuntary intoxication

2

United States v. MacDonald, No. 14-0001/AR

instruction but the error was harmless beyond a reasonable doubt.  Id. at *25-*26, 2013 WL 3376714, at *9.  On this basis, the CCA determined that the findings and sentence were correct in law and fact, and affirmed.  Id. at *32, 2013 WL 3376714, at *10.

On September 3, 2013, Appellant appealed to this Court. United States v. MacDonald, 73 M.J. 40 (C.A.A.F. 2013).  We granted review of two issues:

I.   WHETHER THE ARMY COURT OF CRIMINAL APPEALS ERRED
     IN DETERMINING THAT THE MILITARY JUDGE'S ERROR IN
     QUASHING A SUBPOENA ISSUED TO PFIZER, INC., TO
     PRODUCE RELEVANT AND NECESSARY DOCUMENTS
     REGARDING CLINICAL TRIALS, ADVERSE EVENT REPORTS,
     AND POST-MARKET SURVEILLANCE OF THE DRUG
     VARENICLINE WAS HARMLESS BEYOND A REASONABLE
     DOUBT.

II.  WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION
     IN DENYING A DEFENSE REQUESTED INSTRUCTION ON
     INVOLUNTARY INTOXICATION, AND ERRED IN FAILING TO
     INSTRUCT THE MEMBERS ON THE EFFECT OF
     INTOXICATION ON APPELLANT'S ABILITY TO FORM
     SPECIFIC INTENT AND PREMEDITATION.

United States v. MacDonald, 73 M.J. 238 (C.A.A.F. 2014) (order granting review).  Because we decide Issue II in Appellant's favor and reverse, we need not reach Issue I.

                              SUMMARY

The ultimate questions in resolving the second issue in this case are whether Appellant's ingestion of varenicline (popularly known as and hereinafter referred to as Chantix)

3

should have resulted in an involuntary intoxication instruction and, if so, whether a mental responsibility instruction otherwise rendered the absence of such an instruction harmless beyond a reasonable doubt.

The CCA determined that the military judge erred in failing to give an instruction on involuntary intoxication despite the technically imprecise instruction proffered by the defense. In the words of the CCA, "[t]he evidence presented at trial raised the involuntary intoxication defense." MacDonald, 2013 CCA LEXIS 548, at *26, 2013 WL 3376714, at *8. "The proposed instruction was essentially correct . . . ." Id. at *27, 2013 WL 3376714, at *9. And, "[t]he judge effectively denied the existence of an involuntary intoxication defense." Id. at *21, 2013 WL 3376714, at *7. Because Appellant put on "some evidence" that "reasonably raised" the defense of involuntary intoxication in the form of evidence of ingestion as well as expert testimony regarding the potential side effects of Chantix, we hold that the military judge had a sua sponte duty to instruct on the defense of involuntary intoxication and therefore agree with the CCA's ultimate determination that the military judge erred in failing to give a separate and distinct involuntary intoxication instruction.

Therefore, the key question is whether this instructional error was harmless beyond a reasonable doubt. The CCA concluded

that the error was harmless because the military judge's instruction on mental responsibility otherwise covered the defense of involuntary intoxication. Further, "[e]ven if the requested instruction were given, it is clear beyond a reasonable doubt that the panel would have found appellant guilty of the offenses charged in this case. . . . Appellant cannot escape the overwhelming evidence of his mental responsibility for the offenses he committed." Id. at *29, 2013 WL 3376714, at *9. Similarly, with respect to the military judge's sua sponte duty, the CCA determined that "even if such an instruction were rendered, a rational panel would have found appellant guilty of premeditated murder, as well as the other offenses charged, in light of the overwhelming evidence that appellant was fully able to form the intent necessary to be held criminally liable." Id. at *29, 2013 WL 3376714, at *9. We disagree.

The defense of lack of mental responsibility requires demonstration that the accused suffered from a mental disease or defect and that as a result he was unable to appreciate the nature and quality or wrongfulness of his act. Article 50a, UCMJ, 10 U.S.C. § 850a (2012). In turn, the defense of involuntary intoxication "require[s] a finding that there has been involuntary ingestion of an intoxicant" and that the accused was "unable to appreciate the nature and quality or

wrongfulness of his acts." United States v. F.D.L., 836 F.2d

1113, 1117 (8th Cir. 1988).  As the CCA explained:

> the defense of involuntary intoxication is similar to
> that of lack of mental responsibility in that the
> defense must prove by clear and convincing evidence
> that he did not appreciate the nature and quality or
> wrongfulness of his acts, but different in that he
> need not prove that he suffered a severe mental
> disease or defect, but rather that he was intoxicated
> by some substance that results in what amounts to
> legal insanity.

MacDonald, 2013 CCA LEXIS 548, at *26, 2013 WL 3376714, at *8

(emphasis added).

Without an involuntary intoxication instruction, it is

possible that the members may have concluded that they could not

acquit Appellant without first finding a mental disease or

defect.  It is similarly possible that the members did not

consider, as a separate matter, whether involuntary intoxication

may have prevented Appellant from appreciating the nature and

quality or wrongfulness of his act.  Further, we cannot be

confident beyond a reasonable doubt, as the CCA was, that the

members would have concluded Appellant appreciated the

wrongfulness of his actions if they had been properly instructed

on involuntary intoxication with respect to Chantix.

Consideration of such evidence was and is in the first instance

the responsibility of the trier of fact.

As a result, we are not confident the error did not

contribute to the verdict in this case.

BACKGROUND

### The Events Leading Up to May 18, 2008

At the time of his arrest, Appellant was nineteen years old and had been in the service for approximately a year. Prior to enlisting, Appellant was an active member of his community and led various volunteering and mentoring projects as an Eagle Scout. Upon turning eighteen, both Appellant and his twin brother enlisted in the United States Army. After successfully completing Infantry Training and the Airborne Course, they were both selected for an appointment to the United States Military Academy Preparatory School (USMAPS), class of 2009.

During the pendency of his matriculation to USMAPS, Appellant was assigned to the supply room at Delta Company, Fort Benning, Georgia. Multiple coworkers described him as a peaceful person. On April 18, 2008, a week shy of his nineteenth birthday, Appellant visited the Martin Army Community Hospital to seek help in quitting smoking. According to the medical record, he sought medical help because he had smoked up to a half pack of cigarettes daily for the past three years. During the visit, the Army doctor prescribed Chantix to Appellant as a smoking cessation drug. On May 18, 2008, one month after the Army doctor prescribed Chantix, Appellant fatally attacked Private (PVT) Bulmer while he was sleeping,

stabbing him to death.  Prior to this attack, Appellant did not know nor had he ever interacted with PVT Bulmer.

At the time of Appellant's attack, PVT Bulmer was a twenty-three-year-old recruit who had been in training for three days.  PVT Bulmer was recovering from surgery he underwent prior to his arrival at Fort Benning.  Because of this, PVT Bulmer had been excused by his drill sergeant from drill and ceremony training that day and was instructed to wait in the shade next to the barracks.  Undetected, PVT Bulmer slipped away and went to sleep in his rack.

Meanwhile, Appellant was in his room reading a book and waiting to do laundry.  For some days, however, according to his statement, Appellant had been experiencing "new and strange thoughts" including a "person [was] telling me . . . dangerous things that arent [sic] me."  These included violent thoughts of killing someone.  In fact, the night before the attack, Appellant had asked his girlfriend whether she would still love him if he killed someone.

Appellant eventually left his room to do laundry and without thinking he placed a small, black, double-edged knife into his pocket that he used to cut string.  He headed toward the closest laundry facility, which was in the same bay as PVT Bulmer.  Along the way, Appellant happened upon a sleeping PVT Bulmer.  According to his confession, something "snapped" and he

went "crazy," attacking PVT Bulmer with the knife in his pocket. Appellant first stabbed PVT Bulmer in the neck, intending it to be a fatal blow. PVT Bulmer awakened mid-attack and tried to ward off the blows. His resulting screams and pleas for help drew the attention of nearby trainees. Two soldiers saw the assault through a window. When they realized one man was attacking another, they entered PVT Bulmer's room and intervened. Lashing out at one of the soldiers who tried to stop the attack, Appellant fled to his room, covered in PVT Bulmer's blood. There, Appellant showered, placed all the bloody clothes into a backpack, and hastily left his room wearing civilian clothes. Although the soldiers' intervention had stopped Appellant's assault, PVT Bulmer had already suffered more than fifty knife wounds that would ultimately prove fatal.

By the time Appellant left his room, a general alert had been issued to apprehend the man who attacked PVT Bulmer. A noncommissioned officer (NCO) patrolling the periphery of Fort Benning found Appellant walking along the tree line away from the scene of the crime. When questioned by the NCO, Appellant said he was going to buy a new pair of sneakers on post. Suspecting something was amiss, the NCO questioned Appellant further at which point Appellant attempted to flee. The NCO chased him and physically subdued him until military police arrived and apprehended Appellant.

Taken into custody, Appellant waived his right to remain silent and admitted he had stabbed PVT Bulmer.  In a handwritten statement, he described an internal struggle and that he "was someone else, something was wrong" and that he "want[ed] help." Appellant also acknowledged that he "didn't even know the guy [PVT Bulmer], didnt [sic] think about it before-hand . . . . [w]as telling myself 'NO' . . . [this] wasn't me."  "I fought myself with the idea," he continued, stating that, "I guess I thought I was supposed to kill this man."  Appellant wrote that "I was someone else, something was wrong . . . . I want help." When asked why he stabbed PVT Bulmer, Appellant replied by writing "Insanity, temp." because "this is not who I am, I went crazy for a while, I should have seen the signs, was hurting, I snapped Im [sic] so sorry."  He also admitted that he felt "stretched thin" due to his extended stay as a private at Fort Benning and complained of abuse by drill instructors.  Appellant ended his confession by writing "Im [sic] very sorry, dont [sic] know what happened to me.  Sorry."

## The Escalation of Chantix Warnings

Chantix was approved by the Food and Drug Administration (FDA) in May 2006, at which point the most common side effects listed in the labeling were nausea, changes in dreaming, constipation, gas, and vomiting.  Dep't of Health & Human Servs., FDA, NDA 021928, Chantix, at 25 (May 2006) (Chantix

approval label), available at
http://www.accessdata.fda.gov/drugsatfda_docs/nda/2006/021928_s0
00_Chantix_PrntLbl.pdf (last visited Aug. 27, 2014).  However,
over the course of the next two years, the nature and scope of
the warnings rapidly escalated.  By November 2007, the FDA
issued an update noting that "suicidal thoughts and aggressive
and erratic behavior" were reported in patients taking Chantix.
Dep't of Health & Human Servs., FDA, Early Commc'n About an
Ongoing Safety Rev. of Varenicline (marketed as Chantix) (Nov.
20, 2007), available at
http://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformat
ionforPatientsandProviders/DrugSafetyInformationforHeathcareProf
essionals/ucm070765.htm (last visited Aug. 27, 2014).  The
update revealed that "many cases reflect new-onset of depressed
mood, suicidal ideation, and changes in emotion and behavior
within days to weeks of initiating Chantix treatment."  Id.
Three months later, in February 2008, the FDA issued an Alert to
"highlight important revisions to the WARNINGS and PRECAUTIONS
sections of the full prescribing information . . . regarding
serious neuropsychiatric symptoms" associated with Chantix.
Dep't of Health & Human Servs., FDA, Info. for Healthcare
Prof'ls:  Varenicline (marketed as Chantix) (Feb. 1, 2008),
available at
http://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformat

11

ionforPatientsandProviders/ucm124818.htm (last visited Aug. 27, 2014).  Specifically, the Alert acknowledged that since the FDA issued their November 2007 communication, "it appears increasingly likely that there is an association between Chantix and serious neuropsychiatric symptoms."  Id.  The Alert listed the symptoms as "changes in behavior, agitation, depressed mood, suicidal ideation, and attempted and completed suicide."  Id. The February Alert also stated that while most symptoms "developed during . . . treatment," for others "symptoms developed following withdrawal of Chantix therapy."  Id.

On May 16, 2008, two days before Appellant killed PVT Bulmer, the FDA issued a Public Health Advisory, the third warning in less than six months.  Dep't of Health & Human Servs., FDA, Pub. Health Advisory:  Important Info. on Chantix (varenicline) (May 16, 2008), available at http://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformat ionforPatientsandProviders/DrugSafetyInformationforHeathcareProf essionals/PublicHealthAdvisories/ucm051136.htm (last visited Aug. 27, 2014).  This time the Alert urged patients to stop taking Chantix and to call their doctor right away if they, or their family or caregiver, noticed "agitation, depressed mood, or changes in behavior that are not typical for you, or if you have suicidal thoughts or actions."  Id.  The Advisory stated that "Chantix may cause worsening of a current psychiatric

illness . . . and may cause an old psychiatric illness to reoccur." Id. The Advisory also stated that patients may experience "vivid, unusual, or strange dreams." Id.

By July 2009, the FDA issued a Black Box warning -- the strongest FDA warning level before a drug is pulled from the market. Dep't of Health & Human Servs., FDA, Chantix, at 1 (July 2009) (updated Chantix safety label), available at http://www.accessdata.fda.gov/drugsatfda_docs/label/2009/021928s 012s013lbl.pdf (last visited Aug. 27, 2014). This Black Box warning stated:

> All patients being treated with CHANTIX should be observed for neuropsychiatric symptoms including changes in behavior, hostility, agitation, depressed mood, and suicide-related events, including ideation, behavior, and attempted suicide. These symptoms, as well as worsening of pre-existing psychiatric illness and completed suicide have been reported in some patients attempting to quit smoking while taking CHANTIX in the post-marketing experience.

Id. (emphasis added). In addition to the Black Box warning, this update included the following information under the WARNINGS section:

> Serious neuropsychiatric symptoms have been reported in patients being treated with CHANTIX (See Boxed Warning, PRECAUTIONS/Information for patients, and ADVERSE REACTIONS/Post-Marketing Experience). These post-marketing reports have included changes in mood (including depression and mania), psychosis, hallucinations, paranoia, delusions, homicidal ideation, hostility, agitation, anxiety, and panic, as well as suicidal ideation, suicide attempt, and completed suicide.

Id. at 9 (second emphasis added).

13

Similar warnings were also included in the section titled "Information for Patients" under PRECAUTIONS. For example, one of the bullets in this section noted that "some patients have experienced . . . psychosis, hallucinations, paranoia, delusions, homicidal ideation, aggression, anxiety, and panic." Id. at 13 (emphasis added). Likewise, in the "Post-Marketing Experience" section under ADVERSE REACTIONS, one of the paragraphs noted "[t]he following adverse events have been reported during post-approval use of CHANTIX . . . [t]here have been reports of . . . homicidal ideation, aggression, hostility, anxiety, and panic." Id. at 17 (emphasis added).

## Appellant's Defense Theory at Trial

Appellant argued that use of the smoking cessation drug Chantix was a key factor in his violent, homicidal outburst leading to the tragic death of PVT Bulmer. This defense theory was premised on showing Appellant had Chantix in his system and, given this, that Chantix was a factor in Appellant's fatal stabbing of PVT Bulmer.

1. Presence of Chantix in Appellant's System

On May 19, 2008 -- a day after the fatal stabbing -- Appellant voluntarily supplied a sample of blood and urine. This was later tested by the Armed Forces Institute of Pathology (AFIP) but came back negative for Chantix. From Appellant's perspective, however, the reliability of the AFIP tests was

14

questionable, particularly because AFIP did not have the stability studies necessary for testing pursuant to the correct toxicological standards. Appellant argued that a drug "degrades in urine or blood over time depending on the manner in which it is stored," and the results can be affected by tolerance levels of the testing equipment.

Subsequently, Appellant had his previously collected sample of urine independently tested for the presence of Chantix at NMS Labs -- a private laboratory -- in June 2009, over a year after the death of PVT Bulmer. In contrast to the earlier AFIP test, this time the laboratory had the stability studies from Pfizer. The NMS results reported positive for Chantix. Although questions were raised by both sides about whether the test accurately represented the actual concentration of Chantix in Appellant's system at the time of the incident -- due to the uncertainty regarding the conditions under which the sample was stored and transported, as well as the potential impact on the test result given the passage of time -- the parties proceeded at trial on the basis that there was Chantix in Appellant's system at the time of the incident, as noted in the stipulation of fact.

Based on this positive test, Appellant made a motion for the military judge to reconsider the quashing of an earlier subpoena requesting data from Pfizer regarding Chantix and its

potentially harmful effects.  Appellant requested this reconsideration for several reasons; namely, the positive test result demonstrated the presence of Chantix in Appellant's system at the time of the incident, a new and more severe warning about Chantix had been issued, and the Rules for Courts-Martial (R.C.M.) 706 board had not considered the potential of Chantix influencing Appellant.[1]

However, the military judge denied this motion.  In doing so, the military judge concluded that "'[i]t doesn't make any difference as far as [he could] see whether [Appellant's mental condition was] caused by Chantix or not caused by Chantix.  Chantix is an explanation.'"  MacDonald, 2013 CCA LEXIS 548, at *13, 2013 WL 3376714, at *4.  He continued that:

> the court does not believe that the new evidence or that anything has changed since its last ruling.  The court still believes the proper standard is R.C.M. 703 because this is a court order to a third party, and therefore the defense motion for a reconsideration of its ruling of 24 June is hereby denied.

Id. at *13-*14, 2013 WL 3376714, at *4.

2.  Neuropsychiatric Symptoms Associated with Chantix and the Involuntary Intoxication Instruction

During trial, Appellant provided evidence that Chantix was subject to a number of escalating FDA warnings about its

---

[1] Appellant also argued that Dr. Lupcho -- the psychologist that did the R.C.M. 706 evaluation -- "[n]ever factored into any of her analysis whether or not there was a pharmaceutical or pharmacological basis for the actions of Private MacDonald."

16

potential side effects.  A defense expert in forensic psychiatry, Dr. Glenmullen, provided testimony on the effects of Chantix on the brain's neurochemistry.  Specifically, Dr. Glenmullen described that the level of dopamine in the brain affects a person's behavior and "probably has one of the most profound effects on human emotion and behavior."  Increases in dopamine can cause one to "feel more agitated, irritable, anxious, sleepless; keep turning it up and up you can get manic; keep turning it up and up you can get psychotic."  Dr. Glenmullen elaborated that because Chantix effectively causes an increase of dopamine in the brain, it can be correlated with behavioral changes.  Further, though the side effects of increased dopamine vary, some of the more severe side effects are more likely when there are underlying mental health issues in the patient.

To that end, Dr. Glenmullen conducted an assessment of Appellant and interviewed his friends and family members, concluding that Appellant suffered from three diagnoses of untreated psychiatric conditions.  Specifically, Appellant had a "schizoid personality disorder which was kind of his reaction to his childhood," as well as a "history of long term mild depression" and "psychosis . . . [that included] auditory hallucinations."  These conditions predated Appellant's treatment with Chantix.  Specialist Harrison -- who intervened

during the stabbing of PVT Bulmer -- testified that Appellant was acting "completely crazy," "[l]ike he was possessed." Another expert, Dr. Pancholi, also testified that based on her assessment, Appellant previously suffered from psychotic disorder, schizoid personality disorder, and dysthymic disorder. On this basis, she said she would not have prescribed Chantix to a person with these underlying psychiatric issues. In addition, another defense expert -- Thomas Moore -- testified that due to the serious psychiatric side effects of Chantix, a number of defense and civil agencies had banned the use of this drug. For example, the Department of Defense banned the use of this drug for missile crews and aircraft personnel. Similarly, the Federal Aviation Administration restricted the use of Chantix by all pilots and air controllers and the Department of Transportation banned its use by people driving trucks.

During trial, Appellant argued that he was under the influence of Chantix both before and during the fatal stabbing of PVT Bulmer. To that end, Appellant requested an instruction on involuntary intoxication, which he argued could be a complete defense to the charges or, in the alternative, could negate the element of premeditation and intent.[2] Specifically, Appellant requested the following instruction:

_____

[2] The question this Court is asked to address is whether Appellant was entitled to an involuntary intoxication

> To invoke the defense of involuntary intoxication, the defendant must produce sufficient evidence to raise a reasonable doubt as to the voluntariness of his intoxication. Involuntary intoxication results from fraud, trickery or duress of another, accident or mistake on defendant's part, pathological condition, or ignorance as to the effects of prescribed medication and is a complete defense where the defendant is so intoxicated that he is unable to distinguish between right and wrong, the same standard as applied in an insanity defense. Salahdin v. Gibson, 275 F.3d 1211.

In support, Appellant relied on his experts' testimony. Specifically, Dr. Glenmullen testified that at the time of the incident, Appellant had "substance intoxication" where the substance was Chantix which "essentially catapult[ed] him into the equivalent of an acute psychotic break in a schizophrenic." During the four weeks Appellant took Chantix, Dr. Glenmullen noted that Appellant became more "paranoid" and "thought that people were out to get him," eventually developing "homicidal thoughts" during the fourth week of taking Chantix. Dr. Glenmullen further testified that Appellant's preexisting neuropsychiatric condition was exacerbated by Chantix and because of a Chantix-induced psychosis, he would not have been able to possess the conscious intent to kill. Moreover, Dr.

---

instruction, not whether he was entitled to the instruction requested by Appellant which, admittedly, was flawed but not fatally so. Because we hold that the military judge had a sua sponte duty to instruct on involuntary intoxication we do not reach the issue of whether the military judge should have instructed despite the technically imprecise instruction proffered by Appellant.

Glenmullen specifically referenced "substance intoxication" and testified on cross-examination that involuntary intoxication occurs when an individual takes a prescription drug without correct warnings and is thereby not responsible for his behavior.  In fact, when Appellant raised this issue of the escalating Chantix warnings at trial, he noted that these facts went toward the issue of involuntary intoxication and mental responsibility generally.

Of note, the Government also offered an instruction on involuntary intoxication, albeit using different language. However, the military judge declined to give this instruction or an alternative involuntary intoxication instruction on the basis that his mental responsibility instruction was sufficient. During this exchange, the military judge elaborated:

> MJ:  Got it.  But that's not a correct statement of the law.  It says here, it says where the defendant is so intoxicated [he] is unable to distinguish between right from wrong the same standard is applied in an insanity defense. Don't you need a mental disease -- a serious mental disease or defect causing the accused not to appreciate the wrongfulness of his act or the quality of his act?

> DC:  Sir, that's what I got out of the case, the federal case.

> MJ:  I understand that, but I'm talking about under military law that's passed by Congress does not it require a superior --

> DC:  But I found no military case law to support this

20

> instruction, sir.  But that said, that doesn't
> mean the instruction shouldn't be given.

> MJ:  No, I agree.  I agree that we can look at other
> courts for guidance in a particular area.  But
> Congress is legislator in this area and in my
> view we're bound by the congressional act, and
> therefore I will give the mental responsibility
> instruction I discussed earlier, but not that
> particular one.

Accordingly, the military judge did not provide an

involuntary intoxication instruction.  Ultimately, Appellant was

convicted of all charges and sentenced to a reprimand, reduction

to E-1, total forfeitures, confinement to life without the

eligibility of parole, and a dishonorable discharge.  The

convening authority approved the sentence as adjudged.  Though

the CCA determined that the military judge erred in failing to

issue the involuntary intoxication instruction, the CCA also

held this error to be harmless beyond a reasonable doubt.

Appellant then appealed to this Court.

STANDARD OF REVIEW

The adequacy of a military judge's instructions is reviewed

de novo.  United States v. Dearing, 63 M.J. 478, 482 (C.A.A.F.

2006).  "The military judge bears the primary responsibility for

ensuring that mandatory instructions . . . are given and given

accurately."  United States v. Miller, 58 M.J. 266, 270

(C.A.A.F. 2003); see also R.C.M. 920(a).

If an affirmative defense is reasonably raised by the evidence, the military judge has a sua sponte duty to instruct the members on that defense.  United States v. Davis, 53 M.J. 202, 205 (C.A.A.F. 2000).  A defense is reasonably raised when "some evidence, without regard to its source or credibility, has been admitted upon which members might rely if they chose." United States v. Stanley, 71 M.J. 60, 61 (C.A.A.F. 2012) (internal quotation marks and citations omitted); United States v. Watford, 32 M.J. 176, 178 (C.M.A. 1991) (noting a defense is reasonably raised when there is "some evidence" to which the panel members "might attach credence").  Any doubt regarding whether an affirmative defense instruction is in order should be resolved in favor of the accused.  Davis, 53 M.J. at 205.

"Where an instructional error raises constitutional implications, this Court has traditionally tested the error for prejudice using a "'harmless beyond a reasonable doubt' standard."  United States v. Davis, 73 M.J. 268, 271 (C.A.A.F. 2014) (quoting United States v. Wolford, 62 M.J. 418, 420 (C.A.A.F. 2006)).  The test for determining if the constitutional error is harmless is "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'"  United States v. McDonald, 57 M.J. 18, 20 (C.A.A.F. 2002) (quoting Chapman v. California, 386 U.S. 18, 24 (1967)).  "Whether the error is

22

harmless beyond a reasonable doubt is a question of law that we review de novo." United States v. Simmons, 59 M.J. 485, 489 (C.A.A.F. 2004).

## ANALYSIS

The threshold questions presented are whether the military judge should have instructed on involuntary intoxication and whether there was prejudice in the absence of this instruction.

Involuntary intoxication is an affirmative defense under the UCMJ.[3] Although not expressly listed as an affirmative defense under R.C.M. 916, not all affirmative defenses are listed. See Davis, 73 M.J. at 272 n.5 (C.A.A.F. 2014) ("Although, R.C.M. 916 does not expressly list defense of property as a special defense, this Court and its predecessor have long recognized defense of property as an available defense in the military justice system."). R.C.M. 916 states that the term "defenses" includes "any special defense which, although not denying that the accused committed the objective acts constituting the offense charged, denies, wholly or partially, criminal responsibility for those acts." By its own terms, R.C.M. 916 provides an illustrative rather than an exhaustive

---

[3] The Rules for Courts-Martial suggest that the terms "special defense" and "affirmative defense" are interchangeable. R.C.M. 916(a) Discussion; see also Davis, 73 M.J. at 271 n.3. In this case, it is more accurate to use the term "affirmative defense" because the accused bears the burden of showing it by clear and convincing evidence.

list of defenses.  Further, a number of courts -- including this Court -- recognize involuntary intoxication as an affirmative defense.  See, e.g., United States v. Hensler, 44 M.J. 184, 187-88 (C.A.A.F. 1996); United States v. Craig, 3 C.M.R. 304, 311 (A.B.R. 1952) ("The general rule that involuntary intoxication excuses an accused from criminal responsibility applies where one involuntarily becomes drunk by being compelled to drink against his will, or through another's fraud or stratagem, or by taking liquor prescribed by a physician."); see also Waller v. Tucker, No. 11-21841-CIV-JORDAN, 2011 U.S. Dist. LEXIS 156455, at *40-*44, 2011 WL 9350129, at *14-*15 (S.D. Fla. Dec. 12, 2011); Lucherini v. State, 932 So. 2d 521 (Fla. Dist. Ct. App. 2006); People v. Garcia, 113 P.3d 775 (Colo. 2005); Colon v. State, 568 S.E.2d 811 (Ga. Ct. App. 2002); see generally Phillip E. Hassman, Annotation, When Intoxication Deemed Involuntary So as to Constitute a Def. to Crim. Charge, 73 A.L.R.3d 195 (1976); 2 Crim. Prac. Manual § 40:2 (2014).  In Hensler, this Court recognized involuntary intoxication as an affirmative defense and the Government has not challenged that legal conclusion at trial or on appeal.  Rather, the Government challenge has been to the scope of the defense and its factual applicability in this case.

Here, the CCA determined Appellant provided some evidence at trial that reasonably raised the defense of involuntary

24

intoxication and the military judge erred in not providing a corresponding instruction.  The CCA did not analyze whether involuntary intoxication was an affirmative defense, but summarily concluded:

> As to whether the military judge had a sua sponte duty to address involuntary intoxication as it related to the questions of intent and premeditation, we also find that even if such an instruction were rendered, a rational panel would have found appellant guilty of premeditated murder, as well as the other offenses charged, in light of the overwhelming evidence that appellant was fully able to form the intent necessary to be held criminally liable.

MacDonald, 2013 CCA LEXIS 548, at *29, 2013 WL 3376714, at *9.

We hold that the military judge had a sua sponte responsibility to instruct.  However, unlike the CCA, we are not confident the absence of an involuntary intoxication instruction did not contribute to the verdict.  In determining that the instructional error was harmless beyond a reasonable doubt, the CCA relied on two related conclusions.  First, "[t]he ultimate issue to be decided by the panel relative to each [defense] is sufficiently equivalent to ensure the reliability of the convictions in this case."  Id. at *29, 2013 WL 3376714, at *9.  Second, "even if such an instruction were rendered, a rational panel would have found appellant guilty of premeditated murder, as well as the other offenses charged, in light of the overwhelming evidence that appellant was fully able to form the

25

intent necessary to be held criminally liable." Id. at *29,

2013 WL 3376714, at *9.  We address each argument in turn.

The military judge instructed the members on mental

responsibility as well as partial mental responsibility, which

covered whether or not Appellant was suffering from a mental

disease or defect at the time of the crime.  In doing so, the

military judge relied on Article 50a, UCMJ:

> It is an affirmative defense in a trial by court-
> martial that, at the time of the commission of the
> acts constituting the offense, the accused, as a
> result of a severe mental disease or defect, was
> unable to appreciate the nature and quality or the
> wrongfulness of the acts.  Mental disease or defect
> does not otherwise constitute a defense.
>
> The accused has the burden of proving the defense of
> lack of mental responsibility by clear and convincing
> evidence.

Article 50a(a)-(b), UCMJ; see also 18 U.S.C. § 17; United States

v. Martin, 56 M.J. 97, 103 (C.A.A.F. 2001).  Specifically, the

military judge's instructions read:

> If you determine that, at the time of the offenses,
> the accused was suffering from a severe mental disease
> or defect, then you must decide whether, as a result
> of that severe mental disease or defect, the accused
> was unable to appreciate the nature and quality or
> wrongfulness of his conduct.
>
> If the accused was able to appreciate the nature and
> quality and the wrongfulness of his conduct, he is
> criminally responsible; and this is so regardless of
> whether the accused was then suffering from a severe
> mental disease or defect.
>
> On the other hand, if the accused had a delusion of
> such a nature that he was unable to appreciate the
> nature and quality or wrongfulness of his acts, the

26

accused cannot be held criminally responsible for his acts, provided such a delusion resulted from a severe mental disease or defect.

To summarize, you must first determine whether the accused, at the time of these offenses, suffered from a severe mental disease or defect. If you are convinced by clear and convincing evidence that the accused did suffer from a severe mental disease or defect, then you must further consider whether he was unable to appreciate the nature and quality or the wrongfulness of his conduct. If you are convinced that the accused suffered from a severe mental disease or defect, and you are also convinced by clear and convincing evidence that he was unable to appreciate the nature and quality or wrongfulness of his conduct, then you must find the accused not guilty only by reason of lack of mental responsibility. On the other hand, you may not acquit the accused on the ground of lack of mental responsibility, absent the accused suffering from a severe mental disease or defect, or if you believe that he was able to appreciate the nature and quality and wrongfulness of his conduct.

The military judge also gave an instruction on partial mental responsibility, in which he stated that "[i]n determining this issue you must consider all relevant facts and circumstances and the evidence presented on the issue of lack of mental responsibility." He also noted that members should consider, "in connection with all the relevant facts and circumstances, evidence tending to show that the accused may have been suffering from a mental disease, defect, condition or disorder of such consequence and degree as to deprive him of the ability to entertain these states of mind." The military judge reinforced his instruction by asking the members to "remember that the defense of lack of mental responsibility, that is,

insanity, and evidence that the accused may have lacked the required state of mind are separate defenses although the same evidence may be considered with respect to both." However, as the CCA noted, the "judge's failure to provide the [involuntary intoxication] instruction was aggravated by his failure to even mention Chantix as relevant to the panel's consideration of the defense of lack of mental responsibility and on the question of intent and seriously impaired the defense presentation." MacDonald, 2013 CCA LEXIS 548, at *28, 2013 WL 3376714, at *9.

Because both parties rely on this Court's Hensler decision in support of their argument that involuntary intoxication is either distinct from or subsumed within the defense of mental responsibility, we address it in detail here. And, in fairness to the military judge and the parties, the case can be read to support either proposition. 44 M.J. at 187. Therefore, it is important to distinguish the differences between Hensler and the present case.

In Hensler, the appellant raised a defense of involuntary intoxication against charges of conduct unbecoming an officer and fraternization. At trial, the appellant argued she lacked mental responsibility because of "a confluence of her drugs, her personality traits, her depression, and the introduction of alcohol." Id. at 187 (internal quotation marks omitted). "The military judge provided the members the traditional instruction

28

on the insanity defense," instructing "them that they could presume the accused to be sane unless they were persuaded by clear and convincing evidence that she suffered from a severe mental disease or defect and that, as a result of her severe mental disease or defect, she was unable to appreciate the nature and quality or wrongfulness" of her actions. United States v. Hensler, 40 M.J. 892, 895-96 (N.M.C.M.R. 1994), aff'd, 44 M.J. 184 (C.A.A.F. 1996). The military judge referenced the term "involuntary intoxication" with respect to the issue of whether the appellant "knew that she was fraternizing with enlisted personnel." Hensler, 44 M.J. at 187. He further instructed the members that "alcoholism and chemical dependency is recognized by the medical profession as a disease involving a compulsion towards intoxication." Id. (internal quotation marks omitted).

Following conviction by a general court-martial, Hensler appealed on the basis that this instruction was not sufficient for a defense of involuntary intoxication. On review, this Court affirmed, noting three essential factors. First, the instructions were adequately, although not perfectly, tailored to the evidence. Second, the military judge instructed the members that alcoholism and chemical dependency are a disease. And finally, the government did not dispute the appellant's contention that the combination of psychological problems, job-

related stress, over-medication, loss of liver function, and alcohol consumption could cause a lack of mental responsibility. Id. at 188.

In the present action, like Hensler, the Government did not dispute the possibility of involuntary intoxication by Chantix as it even offered its own set of instructions on involuntary intoxication. However, unlike Hensler, the military judge's instructions were not sufficiently tailored nor did the military judge refer to "involuntary intoxication" or the potential effects of Chantix in the given instructions.

Further, this Court stated in Hensler that "[i]nvoluntary intoxication is treated like legal insanity. It is defined in terms of lack of mental responsibility." Id. at 188 (citing F.D.L., 836 F.2d at 1116-17 ("[T]he mental state of an involuntarily intoxicated defendant is measured by the test of legal insanity.")). It is based on this language that the Government argues that the test of involuntary intoxication is essentially the same as mental responsibility. If this is an accurate statement of law, then clearly the instructions for involuntary intoxication for mental responsibility would be substantially the same and any error in failing to give an involuntary intoxication instruction would be harmless.

The underlying authority on which Hensler is based, namely United States v. F.D.L., however, is more nuanced than the

30

segment quoted in Hensler suggests. 836 F.2d at 1117 (citing 73 A.L.R.3d 203–04 (1976)). In that case, the Eighth Circuit held that involuntary intoxication "cases all require a finding that there has been involuntary ingestion of an intoxicant, usually through trickery, and that the defendant was unable to appreciate the nature and quality or wrongfulness of his acts." F.D.L., 836 F.2d at 1117. Thus, F.D.L. articulates a two-part test for involuntary intoxication. First, that there was an involuntary ingestion of an intoxicant. And second, due to this ingestion, defendant was unable to appreciate the nature and quality or wrongfulness of his acts. This is substantially distinct from a mental responsibility test requiring demonstration of a mental disease or defect and the inability to appreciate the nature and quality or wrongfulness of conduct. To conflate these two defenses is not logical. If the test for involuntary intoxication required a showing of a mental disease or defect in addition to the two-part F.D.L. test, this would essentially be a mental responsibility defense and there would be no reason to utilize an involuntary intoxication defense. Based on the foregoing, we conclude there was not sufficient overlap between an instruction of involuntary intoxication and the given instruction of mental responsibility.

On the first part of the test, neither party disputes that Appellant ingested a medically prescribed drug. We previously

held that intoxication is involuntary when an accused is unaware of the effect of a drug or substance on him. See, e.g., Hensler, 44 M.J. at 188 (concluding that "the defense was not raised as to the remaining five episodes because appellant was on notice that she reacted inappropriately to consumption of alcohol"). Here, the Government argues that MacDonald's intoxication was not "involuntary" because he should have been aware of the effects of Chantix.[4] However, no compelling evidence was presented that Appellant was on notice at the time of the incident that Chantix could cause serious neuropsychiatric symptoms -- the Black Box warning was not published until a year after PVT Bulmer's death -- or that he might suffer unanticipated side effects from Chantix.

With respect to the second part of the test, Appellant's expert witness, Dr. Glenmullen, testified that to be "under the influence of a drug" meant that "a drug is affecting you . . . . [y]ou can, in some instances, be under the influences of a drug in ways that alters your behavior beyond your control." (Emphasis added.) Moreover, Appellant's expert witnesses diagnosed Appellant as suffering from preexisting mental conditions and believed Appellant suffered a short-lived, psychotic episode at the time of the stabbing which rendered him

---

[4] The defense also requested an instruction on "evidence negating [a] voluntary act." The military judge declined to give such an instruction and the issue was not appealed to this Court.

unable to appreciate the wrongfulness of his conduct.  For example, defense expert Dr. Pancholi testified that at the time of PVT Bulmer's stabbing, Appellant was psychotic.  She further explained, "[b]asically psychosis is when an individual has a break in their perception of realities.  So they lose contact with reality and so the onset of psychosis is gradual."  She also noted that "it's not an on/off switch," but rather a "progression where you're slowly losing contact with reality and then when you're coming out of a psychotic episode it's a similar progression to where you can return back to having contact with reality over a period of time."  Similarly, Dr. Glenmullen concluded that Appellant was psychotic at the time of PVT Bulmer's stabbing and that psychiatric conditions or drugs can cause psychosis.  He noted that Appellant's psychosis was a combination of "underlying schizoid personality disorder and psychotic disorder[, and] auditory hallucinations," such that he was the "last person in the world you'd want to give Chantix to . . . the affect of the Chantix is the combination."  Dr. Glenmullen further testified that Appellant was unable to form the conscious intent to kill "because of the psychosis," and that Appellant was suffering from a severe mental disease or defect at the time of the incident which was a "Chantix induced psychosis."  In addition, several witnesses testified to Appellant's disposition during the commission of the crime,

including one who stated Appellant was "[a]cting completely crazy like he was possessed or something."

Given that a defense of involuntary intoxication is substantially different from a defense of mental responsibility, because it includes a distinct threshold prong, we are unable to conclude it was harmless beyond a reasonable doubt not to instruct the members on this separate defense. Several experts provided "some evidence" that Chantix affected Appellant's ability to appreciate the nature and quality or wrongfulness of his acts. There was also "some evidence" from Pfizer and the FDA, including the rapidly escalating warnings that culminated in a Black Box warning, that Chantix could have dramatic adverse effects on some patients.

Moreover, we cannot and do not know whether the members may have determined that Appellant did not suffer from a serious mental disease or defect at the time of the murder and declined to consider the second prong of the mental responsibility defense. Further, if involuntary intoxication was not a complete defense it could have been a partial defense by negating an element in specific intent or premeditation. As such, the members were not told that involuntary intoxication itself or in combination with Appellant's other conditions could impact his ability to appreciate the nature and quality of wrongfulness of his act. As a result, we are left with

34

reasonable doubt as to whether the absence of an instruction contributed to the verdict.

The Government argued that the evidence of Appellant's ability to form the necessary intent was so overwhelming that Appellant could not be prejudiced by any error. In doing so, the Government cites Appellant's actions prior to and immediately following the murder of PVT Bulmer as evidencing a state of mind that is rational and reflective of a person cognizant of the nature and quality of his actions. For example, Appellant telephoned his girlfriend the evening before the murder and asked whether she would "still love me if I killed someone." Appellant also acknowledged the "idea of violently killing someone, wasnt [sic] always, wasnt [sic] much at all, only a little, however, I was more willing 'to do' whatever I thought about doing because I was so streched [sic] thin." The Government also argues that Appellant acted in a rational manner when he armed himself with a double-edge knife en route to the laundry room and had the "presence of mind to stalk a sleeping victim inside a barracks where he would not be recognized and when no witnesses were present." Moreover, after the attack, Appellant fled the scene, showered, and attempted to escape from the base.

There are two reasons why this evidence is not so overwhelming as to render the instruction harmless beyond a

reasonable doubt.  First, although the evidence that the Government cites could be viewed as compelling evidence that Appellant was mentally responsible for his actions, it does not account for the defense expert testimony that the Chantix may have affected Appellant's mental state and capacity at the time of the incident such that he was "under the influence" of Chantix.  In a related manner, some if not all of the evidence that the Government cites could support an involuntary intoxication defense as well as refute it.  For example, Appellant's statements to his girlfriend could manifest premeditated intent, or they could manifest the sort of uncontrolled "homicidal ideation" Appellant argues Chantix may induce.  That leads to the second reason we are not ultimately persuaded that the evidence was sufficiently overwhelming on the question of intent to negate any error.  Where the evidence can support multiple arguments, the accused is entitled to have the trier of fact, in this case the members, and not an appellate court, hear and test the credibility of the evidence based on proper instructions.

In sum, the instructions for involuntary intoxication were not substantially the same as those given for mental responsibility, and the Government did not meet its burden to demonstrate that failure to properly instruct was harmless beyond a reasonable doubt.

CONCLUSION

We conclude that the military judge erred in failing to issue a separate instruction on involuntary intoxication and that contrary to the CCA's conclusion the error was not harmless beyond a reasonable doubt.

Accordingly, the decision of the United States Army Court of Criminal Appeals is reversed. The findings and sentence are set aside. The record of trial is returned to the Judge Advocate General. A rehearing is authorized.