UNITED STATES, Appellee,

v.

Wayne F. FACEY, Senior Airman, U.S. Air Force, Appellant.

No. 55,549.
ACM 25085.

U.S. Court of Military Appeals.

Sept. 26, 1988.

For Appellant: *Captain Timothy J. Malloy* (argued); *Colonel Leo L. Sergi* (on brief); *Captain Raymond J. Hardy, Jr.*, USAFR.

For Appellee: *Captain Marc Van Nuys* (argued); *Colonel Joe R. Lamport* (on brief); *Colonel Kenneth R. Rengert.*

## Opinion of the Court

EVERETT, Chief Judge:

Contrary to appellant's pleas, a general court-martial with members convicted him of two specifications of conspiracy to commit housebreaking and larceny, two specifications of larceny, and two specifications of housebreaking, in violation of Articles 81, 121 and 130 of the Uniform Code of Military Justice, 10 U.S.C. §§ 881, 921, and 930, respectively. The sentence adjudged was a dishonorable discharge, confinement and forfeiture of $350.00 pay per month for 3 years, and reduction to airman basic. After the convening authority approved, and the Court of Military Review affirmed, the findings and sentence as adjudged, this Court granted review to determine whether the convictions should be set aside and the charges dismissed because of a claimed violation of speedy-trial requirements under R.C.M. 707(a), Manual for Courts-Martial, United States, 1984. 23 M.J. 53 (1986).

### I

The evidence offered in connection with Facey's motion to dismiss for lack of speedy trial consisted of his testimony, an oral stipulation as to the testimony of his commander, Major Donald L. Sorensen, and the testimony of Chief Master Sergeant John R. Groom, III. According to all the evidence, appellant initially had been placed in pretrial confinement on September 28, 1984. Then, on October 1, he was released from confinement and restricted to Edwards Air Force Base, with the additional limitation that he "not ... go into the housing area or within one mile of any gate" on the base. On November 15, 1984, Major Sorensen "lifted" this restriction; and at this time, he had a conversation with Facey concerning travel limitations. On March 27, 1985, the charges were preferred against appellant. On May 24, the Article 32, UCMJ, 10 U.S.C. § 832, investigation was completed; and on June 12, 1985, the charges were referred to a general court-martial. The court-martial was originally scheduled to begin on June 26, 1985; and, after a prosecution request for delay was granted, it actually commenced on July 15.

According to the stipulated testimony of Major Sorensen, on November 15, 1984, he "advised the accused that he should remain available within the local area. The local area was defined as the Lancaster, Rosemond, and Palmdale area. He could go to Los Angeles, he could not go to Las Vegas and the purpose of this 15 November 84, advice as to limits was to make the accused available for any processing necessary for the court-martial case." [1]

Chief Master Sergeant Groom testified that he had heard a conversation between Major Sorensen and appellant and that [t]he conversation had two purposes. Number one it lifted restriction that had been put on Airman Facey about two weeks prior to that and—no excuse me about six weeks prior to that and it—well basically, it told Airman Facey to remain available in the general area of Edwards in case he was needed.

Major Sorensen had "specifically said that ... [appellant and his co-accused] could go to Los Angeles"; but "he said don't go to

---

1. When the military judge recited his understanding of the oral stipulation, trial counsel indicated that "group of court-martial cases" should be substituted for "the court-martial case." Apparently, he was referring to the fact that there were other airmen who were tried in connection with the break-ins for which Facey was investigated and tried. Apparently, the accused accepted this amendment to the stipulation.

San Diego or Las Vegas."[2] According to Groom, it was 35 miles from Edwards Air Force Base to Lancaster, about 100 miles to Los Angeles, 250 to San Diego, and 300 miles to Las Vegas. Groom testified that "[t]he general policy" of his squadron was "that people should inform their immediate superior if they are going to be out [of] the local area" and that the limitation that Major Sorensen had placed on Facey's mobility was "no greater than" what "any other member" of the squadron was subject to. Moreover, when personnel arrived in the squadron, they were briefed "that they should inform their immediate superiors, if they are going to be out of the immediate area." In briefings that Groom had given to squadron personnel, he had informed them "to let supervisors know if they are going outside of the area"—"going any further than L.A."

Facey's testimony was that, on November 15, he and his co-accused "got called down to the commander's office and he took us off restraint and he said that we were still on administrative hold or some kind of hold and we were not allowed to leave the vicinity. We could go to Lancaster or Palmdale, but we were not allowed to go over the hill and he said that includes L.A." This limitation had never been "lifted." Facey never "ask[ed] for any leave or any permission to go over the hill," because when two of his co-accused had "tried to get some leave," they had been "denied"; "and my position was more deeper involved in this matter." His co-accused had told him that their leave request had been denied "because we were only on administrative hold and were unable to take leave." Facey's home was in Los Angeles; but the only time that he had been there since November 15, 1984, had been a few days before trial, when he was allowed by his supervisor to go to the Los Angeles airport and pick someone up. When asked by the

military judge what "going over the hill or going over the mountain" meant to him, Facey responded, "The commander knows that I am from L.A. So, I took it that he meant L.A. He did say L.A."

In connection with the oral argument on the defense motion to dismiss pursuant to R.C.M. 707(a), the prosecution argued that the period from September 28, 1984, to April 19, 1985, should be excluded from the period for which the Government was accountable. In his view, this delay resulted in part from "extraordinary circumstance involving the volume of property involved." Moreover, it had been necessary to await the trial on April 18, 1985, of a co-accused, Airman Miller, who on September 27, 1984, had given a full confession concerning the larcenies and housebreakings in which Facey was implicated. Additional delay from June 26—when the trial was originally scheduled to begin—until July 15—when it actually began—was attributed by the prosecution to unavailability of a circuit trial counsel to try this complicated case and to preparation of an 84–page document concerning "320 different items of stolen property."

On the basis of the evidence and arguments, the military judge found that from September 28 until October 1, 1984, Facey had been "in pretrial confinement"; and then until November 15, he had been "under pretrial restraint in lieu of arrest." However, from November 15 until the time of trial, he had been

> under the same local area travel restrictions as any other member of his unit; specifically, under the terms laid out by Major Sorensen, his commander, the accused was allowed to go to Los Angeles. At most, during this period, he was under the type of administrative hold contemplated by Rule for Courts-Martial

2. Groom acknowledged that, in an earlier statement, which was introduced in evidence, he had asserted that "[a]t that time he did advise each of them to remain available in the general area—a term I specifically recall him using was 'Don't go over the mountains' and exp[lain]ed that they could go to Lancaster, Palmdale, etc.,

but not to go to Los Angeles, Las Vegas, etc." Groom said, however, that on the basis of a telephone conversation with Major Sorensen on the morning of the trial, he believed that Sorensen had said it's "San Diego" rather than "Los Angeles."

304(h).... [He] was not under pretrial restraint as defined in Rule for Courts-Martial 304(a)(1) or (a)(2) from 15 November 1984 to the present.... Airman Miller, a substantial witness who was relevant and necessary to the Government's case, was unavailable within the meaning of R.C.M. 707(c)(5)(A) from 28 September 1984 until the conclusion of his trial on 18 April 1985 .... [and] the prosecution was unable to proceed to trial from 26 June 1985 until 15 July 1985, due to additional time needed and justified to prepare the prosecution case pursuant to Rule for Courts-Martial 707(b)(5)(B) and due to unavailability of circuit counsel certified pursuant to Article 27, UCMJ, a military exigency pursuant to Rule for Courts-Martial 707(c)(8).... [Finally,] the Government has acted with due diligence in the prosecution of this case.

On the basis of these findings, the military judge concluded that the period accountable to the Government was far less than the 120 days which would have required dismissal of the charges.

Senior Judge Sessoms, writing for a unanimous panel of the Court of Military Review, found that after November 15, 1984, the only limitation applying to Facey was a "general squadron policy" concerning travel outside the vicinity of Edwards Air Force Base; that this "policy applied to all squadron members and was not intended as a punitive measure against any individual member"; and "that such a general policy does not constitute an imposition of restraint under R.C.M. 304." In light of this finding, the court below concluded that it was "unnecessary" to decide whether the military judge had properly calculated the days to be deducted from the period of government accountability. Unpub. op. at 3.

**3.** Executive Order 12550, dated February 19, 1986, 51 Fed. Reg. 6497, amended R.C.M. 707(a) of the Manual for Courts-Martial, United States, 1984, to eliminate reference to "conditions on liberty" in R.C.M. 304(a). Apparently, there had been great confusion and uncertainty as to the significance of the phrase "conditions on liberty"—as is illustrated in this case—and the Presi-

## II

### A

■ According to R.C.M. 707(a), "[t]he accused shall be brought to trial within 120 days after ... the imposition of restraint under R.C.M. 304"—subject to certain exclusions authorized by this rule. Since Facey had been placed in confinement on September 28th, 1984, there is no question that the 120–day period initially started to run at that time. However, R.C.M. 707(b)(2) provides that, "when no charges are pending—if the accused is released from pretrial restraint for a significant period, the time under this rule should run only from the date on which charges or restraint are reinstituted." Since charges were not preferred until much later—namely, March 27, 1985—the termination on November 15, 1984, of the restraint to which appellant had been subject would preclude consideration for speedy trial-purposes of the earlier restraint. Indeed, since no new restraint was imposed from November 1984 until appellant's trial, the new 120–day period would commence when the charges were preferred on March 27, 1985.

■ The issue, however, is whether appellant was free from pretrial restraint after November 15, 1984. As R.C.M. 304(a) then read, "Pretrial restraint may consist of conditions on liberty, restriction in lieu of arrest, arrest, or confinement." [3] In turn, R.C.M. 304(a)(1) stated that "[c]onditions on liberty are imposed by orders directing a person to do or refrain from doing specified acts. Such conditions may be imposed in conjunction with other forms of restraint or separately." According to the rule, "Restriction in lieu of arrest is the restraint of a person by oral or written

dent decided that such "conditions" should no longer be viewed as constituting pretrial restraint. Apparently, he concluded that "conditions on liberty" constitute such a "minimal infringement on liberty" that they "do not warrant imposition of the speedy trial requirements." Analysis to 1986 amendments to R.C.M. 707, at A21–37, Manual, *supra*.

orders directing the person to remain within specified limits ..."

After November 15, Facey clearly was not under "restriction in lieu of arrest," because there were no "specified limits" to which he was subject. In our view, such "limits" do not include a limitation of travel to the "local area" of Edwards Air Force Base—especially when that "local area" apparently covered an area within a radius of 100 miles from the base.

The definition of "conditions on liberty" is broad enough to permit a strong argument that, after November 15, 1984, appellant was subject to such "conditions." However, the findings by the military judge, as reaffirmed by the Court of Military Review, undercut this argument. If Facey was subject only to a "general squadron policy" limiting travel, we do not believe that this limitation constituted a condition on liberty within the meaning of R.C.M. 304. The Manual is concerned with impairments of a servicemember's freedom which derive from his status as an accused, rather than those which are shared with all the members of his unit.

Admittedly, there is evidence which is contrary to the judge's findings. However, since Facey never requested leave to visit his family in Los Angeles and since, on the one occasion when he asked to go to the Los Angeles area, he was allowed to do so, we can hardly say that the judge's findings were clearly erroneous.[4]

We recognize, also, that during an investigation or in preparation for trial, it is often necessary to deny leave not only to the accused but also to witnesses and other trial personnel. Otherwise, the investigation or trial may be substantially delayed or impeded. We doubt that the President ever intended that limiting an accused to an area within 100 miles of his organization would constitute a condition on liberty, even if the limitation were not part of a

general unit policy but was, instead, designed to assure the accused's availability for trial. However, in view of the findings in this case and the change in the language of R.C.M. 707(a) (*see* n. 3, *supra*), we need not inquire further at this time into the meaning of "conditions on liberty."

### B

▮ As an alternative to his determination that on November 15, 1984, appellant had been "released from pretrial restraint" and was not subjected thereafter to restraint, the military judge allowed the Government generous deductions from the period of time for which it was accountable. For example, he subtracted 202 days—the interval between appellant's initial confinement on September 28, 1984, and April 18, 1985, when a co-accused, Airman Miller, was tried. However, this deduction was based on the oral argument, rather than on any evidence or stipulation.

Since the Government has the responsibility of establishing its entitlement to any deductions from the period for which it would otherwise be accountable under R.C.M. 707, any deficiency of evidence must be laid at its door. Thus, clearly the finding was unsupported and provided no basis for the military judge's denial of the motion to dismiss.

▮ Furthermore, even if the judge had relied on evidence rather than merely on the arguments by counsel, the deduction that he allowed was excessive. Even though it ultimately appears that testimony of a co-accused may be necessary, R.C.M. 707(c)(8)—which allows deduction of "[a]ny other period of delay for good cause"—never contemplated that the Government would have no accountability for any of the period prior to a co-accused's trial. Some portion of the 202-day period prior to April 18, 1985, would have to be attributed to the time required for investigation by the

---

4. Although Groom's testimony about the squadron policy was in terms of "informing" superiors of an intent to go further away than Los Angeles, we infer from the practical reality of the military environment that, at least implicit-

ly, this involved seeking permission for such a venture. Accordingly, the conditions on appellant's liberty and those on the other squadron members under the squadron policy essentially were the same.

Government in preparation for trial that would have been necessary whether the co-accused, Airman Miller, was willing to testify before his own trial. It was the judge's responsibility to receive evidence in this regard and then decide how much of the delay was necessary to await the trial of the co-accused.

■ The defense contends that the Government never established that Miller was an unavailable witness prior to his own trial. Certainly, the Government bears the responsibility for demonstrating that there has been a "delay for good cause" within the meaning of R.C.M. 707(c)(8); and since the Government offered no evidence that Miller would not have testified earlier, it obviously failed to carry its burden.

■ The defense also points out that Airman Miller had made a full confession on September 27, 1984—which, in fact, had led to appellant's confinement the next day—and, in light thereof, there was no reason to believe that he would not have been willing to testify for the Government, even without an immunity grant. We, however, do not believe that a co-accused who has made a pretrial confession is thereby automatically available to the Government as a witness. In the first place, he may intend to claim that the confession was inadmissible against himself; and then he certainly would not wish to incriminate himself by testifying. Furthermore, making a pretrial confession does not waive the privilege against self-incrimination; and Airman Miller was certainly entitled to claim his privilege if called as a witness at appellant's trial. However, as part of the Government's showing of unavailability, trial counsel should at least offer some evidence that the prospective government witness intends to claim his privilege against self-incrimination if called to testify without a grant of immunity.

■ Finally, the defense argues that the delay to await the conclusion of Miller's

trial was not "for good cause" under R.C.M. 707(c)(8) because Miller could have been made available at any time by means of a grant of testimonial immunity. R.C.M. 704(a)(2). We recognize that testimonial immunity provides a means to obtain the testimony of a witness who might otherwise successfully claim the privilege against self-incrimination. *See United States v. Gardner,* 22 M.J. 28 (C.M.A.1986); *United States v. Villines,* 13 M.J. 46, 59 (C.M.A.1982) (Everett, C.J., dissenting). However, we do not agree with the defense contention that, for purposes of speedy trial, the Government is precluded from claiming "good cause" when it delays trial of an accused in order to await completion of the trial of a co-accused or other government witness who intends to claim the privilege against self-incrimination if called to testify.

A grant of testimonial immunity—although less onerous to the Government than transactional immunity—does place a burden on prosecutors. They must be in a position to show that evidence they subsequently use at trial has not been tainted in any way by the immunized testimony. *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972); *United States v. Gardner* and *United States v. Villines,* both *supra.* Sometimes the prosecutor who tries the case in which immunized testimony is received is precluded from participating in the subsequent trial of the witness who has been immunized or even from having any contact with the persons who participate in that subsequent prosecution. *United States v. Gardner, supra.* These factual concerns lead us to conclude that delaying a trial in order to await trial of a material government witness who would be entitled to plead the privilege against self-incrimination should usually be treated as "good cause" for purposes of R.C.M. 707(c)(8).[5]

5. Even in applying the Sixth-Amendment guarantee of a speedy trial, it has been recognized that the trial of one defendant may be delayed to await the outcome of the trial of the co-de-

fendant. *See Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) (trial delayed for several years while awaiting completion of trial and appeal in a co-defendant's case).

Occasionally it may become clear that a prosecutor is seeking to excuse his negligence or slipshod preparation by claiming that he was waiting for the conclusion of the trial of a prospective government witness; and, if it is clear to the judge that trial counsel had no real need for this witness, he may decide that "good cause" has not been shown. However, generally, we believe that a military judge may properly subtract from the period of government accountability a delay incurred in order to await trial of a material government witness who is entitled to claim, and foresee-ably will claim, his privilege against self-incrimination.

## III

Because appellant was not under "pre-trial restraint" after November 15, 1984, as found by the military judge and by the Court of Military Review, he was not denied a speedy trial.

The decision of the United States Air Force Court of Military Review is affirmed.

Judges COX and SULLIVAN concur.