# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
ALDYKIEWICZ, SALUSSOLIA, and WALKER
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Sergeant MICHAEL A. HORNER**
**United States Army, Appellant**

ARMY 20190249

Headquarters, 8th Theater Sustainment Command
Mark A. Bridges, Military Judge
Lieutenant Colonel Michael C. Friess, Staff Judge Advocate

For Appellant: Captain Catherine E. Godfrey, JA (argued); Lieutenant Colonel Tiffany D. Pond, JA; Major Benjamin A. Accinelli, JA; Captain Catherine E. Godfrey, JA (on brief); Lieutenant Colonel Angela D. Swilley, JA; Major Jack D. Einhorn, JA; Captain Catherine E. Godfrey, JA (on reply brief); Major Jodie L. Grimm, JA.

For Appellee: Captain Thomas J. Darmofal, JA (argued); Colonel Steven P. Haight, JA; Lieutenant Colonel Wayne H. Williams, JA; Major Dustin B. Myrie, JA; Captain Thomas J. Darmofal, JA (on brief).

13 November 2020

-----------------------------------
MEMORANDUM OPINION
-----------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

WALKER, Judge:

Appellant raises three assignments of error, two of which merit discussion, but no relief.[1]

---

[1] We have also given full and fair review of the matters appellant personally submitted pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982) and find those matters worthy of neither discussion nor relief.

Appellant asserts, for the first time on appeal, that the government violated his constitutional due process rights when it failed to comply with his request, made while undergoing a magistrate authorized sexual assault forensic examination (SAFE), to collect and analyze his blood for illicit substances based upon his belief he had been drugged on the night of the charged offenses. He further asserts that the military judge erred in preventing the defense forensic toxicology expert from testifying about the effects of elicit substances, such as GHB, ketamine, and PCP, in support of his involuntary intoxication defense. We disagree and affirm.

A panel of officers sitting as a general court-martial convicted appellant, contrary to his pleas, of one specification of maltreatment and one specification of indecent conduct, in violation of Articles 93 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 893, 934 (2016) [UCMJ]. The panel found appellant not guilty of the more serious offenses of sexual assault and forcible sodomy, in violation of Articles 120 and 125, UCMJ. The convening authority approved the adjudged sentence of a bad-conduct discharge and reduction to the grade of E-1.

## I. BACKGROUND

### A. Appellant's Maltreatment of Specialist DS and Indecent Conduct

A night of celebration and alcohol consumption at a bar in Guam resulted in indecent conduct of which neither the victim nor appellant had any memory. On the evening of 1 December 2017, appellant, Specialist (SPC) Johnson, SPC English, and SPC DS decided to frequent a local bar in Guam to celebrate SPC English's and SPC DS's last night on the island before returning to Hawaii. Appellant was SPC DS's supervisor at the time. The four soldiers began the celebration in SPC Johnson's hotel room by hanging out and consuming a few drinks. Specialist DS consumed Hennessey mixed with apple juice while SPC Johnson and SPC English mixed Crown Royal with apple juice. Appellant brought a rum and Coke with him to the hotel room, the only alcoholic drink he consumed that day prior to going to the bar.

Appellant, as the designated driver, drove the group to a club known as "The W," where they arrived at approximately 2300. Upon arrival, the group ordered a round of beers and shots and played beer pong with cups filled with water. Specialist DS and appellant both became very intoxicated over the course of the evening. The last drink SPC DS recalls consuming was a Coke mixed with Jack Daniels which tasted "funny." Both SPC DS and appellant last recall smoking a cigarette together, until SPC DS awoke in a parking lot surrounded by strangers.

At approximately 0200 on 2 December 2017, Ms. Lipp and Ms. Foley were walking home from work and noticed what they believed was a male and female engaging in sexual intercourse on a car in a parking lot. Something to them seemed "off" about what they saw so they decided to investigate. As they drew closer, Ms.

Lipp and Ms. Foley noticed that it was two males, one of whom was unresponsive and face down on the hood of a car while the other male was anally penetrating him. The women watched in shock as they witnessed appellant anally penetrate SPC DS, pause and masturbate, and then penetrate SPC DS again. Recognizing that SPC DS was unresponsive, both females told appellant to stop but appellant just looked at them and continued thrusting towards SPC DS. Ms. Foley noticed appellant was "sweating profusely." Ms. Lipp described appellant as having a "glazed over look on his face" and being "emotionless." When appellant did not respond to them, the two females called a male friend, Air Force Master Sergeant (MSgt) Cook, for assistance. A few minutes later, appellant stopped at which point SPC DS crumpled to the ground moaning and unresponsive with his pants around his thighs. As soon as MSgt Cook arrived to the scene, he directed appellant to take a seat in the bed of a truck nearby. Master Sergeant Cook then helped SPC DS regain consciousness and assisted him in standing up. As SPC DS struggled to stand up, MSgt Cook noticed that SPC DS swayed back and forth. At that point SPC DS apologized for being drunk and then began vomiting. Master Sergeant Cook could not understand SPC DS when he spoke and noticed he smelled of alcohol. Not long after, SPC English arrived and found SPC DS leaned against a fence "just, kind of, holding himself up and trying to gather himself" and described SPC DS as "confused and out of it."

Meanwhile, SPC Johnson searched for appellant. While doing so, he received a telephone call from appellant who "really couldn't talk" and was slurring his words. A few moments later, SPC Johnson located appellant walking down the street "wobbling" and he appeared "drunk" and "aggressive." When SPC Johnson approached appellant to speak with him, appellant became verbally abusive. Specialist Johnson also noticed that appellant smelled of alcohol. Specialist Johnson assisted appellant to the vehicle the soldiers used to get to the bar. Appellant immediately fell asleep after getting in the vehicle.

Upon returning to their respective hotel rooms, SPC DS explained to SPC English and SPC Johnson that he could not recall how he ended up in a parking lot surrounded by strangers. Specialist DS also told them that he was experiencing pain in his buttocks area. Specialist English and SPC Johnson then showed SPC DS a short video clip of appellant's indecent conduct with him taken by Ms. Lipp. At that point, SPC DS elected to file a restricted report of sexual assault.[2]

---

[2] A restricted report allows a sexual assault victim to disclose confidentially the details of an assault and receive medical treatment and counseling without triggering an official investigation. *See* Army Reg. 600-20, Army Command Policy, para. 7-9(b) (24 Jul. 2020).

*B. Specialist DS and Appellant's Sexual Assault Forensic Exams*

A few days after the incident SPC DS elected to undergo a SAFE. During the SAFE, SPC DS indicated "unsure" on the examination form[3] regarding whether there was any involuntary ingestion of drugs or alcohol. Specialist DS informed the Sexual Assault Nurse Examiner (SANE) that he "d[id] not remember anything that happened from midnight to 0330 on 2 December 2017" and had a "loss of consciousness while smoking a cigarette, for about 3 hours until he woke up in a parking lot" in the early morning hours of 2 December 2017. Since SPC DS was filing a restricted report, the SANE who conducted his examination did not collect any blood or urine for toxicology analysis to determine whether there were any substances in SPC DS's system. After conducting the SAFE, SPC DS decided to file an unrestricted report of sexual assault resulting in a law enforcement investigation.

Military law enforcement obtained a search authorization requiring appellant to submit to a SAFE. On 4 December 2017, just two days after the charged offenses, a military law enforcement agent escorted appellant to Naval Hospital Guam for a SAFE and accompanied appellant during the examination. The SANE conducted the examination in accordance with the authorization which authorized collection of buccal swabs and the sexual assault kit. She collected buccal swabs, penile swabs, and took photographs of various lacerations, bruising, and redness on various parts of appellant's body. The SANE did not collect blood or urine because it was not specifically outlined in the authorization for collection.

*C. Appellant's Involuntary Intoxication Defense at Trial*

Appellant attempted to present an involuntary intoxication defense at trial without significant evidence to support such a defense. The other three soldiers with whom appellant went out testified that alcohol was the only substance they witnessed appellant ingest. Specialist Johnson testified, corroborated by SPC English and SPC DS, that they each had three shots and two beers at the bar. Specialist English and SPC Johnson testified that at some point they became separated from appellant and SPC DS. They also testified that neither of them was as intoxicated as appellant and SPC DS when they located each of them in the early morning hours of 2 December 2017. Ms. Foley testified she observed that appellant was "sweating profusely" that night. Ms. Lipp described appellant as having a "glazed over look on his face" and being "emotionless." However, Ms. Lipp and MSgt Cook testified that appellant acknowledged their verbal communication with

---

[3] Dep't of Def., Form 2911, DoD Sexual Assault Forensic Examination (SAFE) Report (Sept. 2015).

4

him. Specialist Johnson testified that appellant smelled of alcohol, was slurring his words, "wobbling" while he walked, and appeared "drunk" and "aggressive."

Appellant's own testimony was the main evidence he presented of involuntary intoxication. Appellant testified that he consumed a rum and Coke prior to arriving at the bar that evening. Once at the bar he recalled consuming one shot of alcohol and one beer. Appellant testified his last memory was smoking a cigarette with SPC DS. He testified he awoke the next afternoon without any clothing on, "completely out of it" mentally and physically, and that it was not just a typical hangover. Appellant admitted that it was not unusual for him to consume alcohol but that the amount of alcohol he consumed that night would not have caused him to blackout and lose memory, which led him to believe he had been drugged. Appellant also testified that he did not let his cigarettes out of his sight that evening and never saw anyone tamper with them at the bar.

Appellant explained that during the SAFE he asked the SANE to collect his blood and test it for drugs since he could not recall events from the night of the charged offenses. Appellant testified that the SANE informed him that drugs only remain in your system for a period of time, she could not collect his blood as part of her examination, and he would have to come back to the hospital as a patient in order to have his blood collected. Appellant also testified that the SANE told him that by that time, any drugs in his system would not show up. Appellant testified he relied on the SANE's guidance that any drugs in his system would not show up on a test so he never went back to the hospital to get his blood tested. The evidence concerning appellant requesting a blood test, however, was less than clear. For example, the SANE testified appellant never requested a blood test. Air Force Office of Special Investigations Special Agent (SA) WB, who was present in the examination room during appellant's SAFE, testified appellant did request a blood test. According to SA WB, the SANE told appellant she could not draw his blood as part of the SAFE, or words to that effect.

Prior to the testimony of a defense expert in forensic toxicology, the government objected to the expert testifying about various drugs that might have caused appellant's blackout and reactions on the night of the charged offenses. Specifically, the defense intended to have its expert testify about GHB, ketamine, and PCP. The defense counsel argued that appellant should be allowed to put forth an alternate explanation for his level of intoxication and condition on the night in question, particularly given the government's focus on witnesses testifying about their belief that appellant was drunk on alcohol. The military judge ruled that he did not see the relevance of any testimony about particular drugs and their effect on appellant, and the forensic toxicologist could not testify about the effects of any of those substances "because there is no evidence that Sergeant Horner ingested any substances – or any particular substance that night other than alcohol." The military

judge did, however, permit the forensic toxicologist to testify about whether alcohol might have caused appellant's blackout or caused him to act the way he did.

Appellant's forensic toxicologist testified about both appellant and SPC DS's consumption of alcohol and resulting level of intoxication that night based upon witness observations and each soldier reporting a loss of memory. The defense expert testified that appellant's consumption of four drinks that night over the course of two to three hours, based upon evidence presented at trial, would not have resulted in a blood-alcohol level consistent with appellant's conduct and behavior. She also testified that SPC DS's consumption of up to six drinks, as he testified to, would not have resulted in a blood-alcohol level high enough to explain his memory loss, vomiting, and loss of consciousness. Lastly, she testified that she found it highly unusual that SPC Johnson and SPC English did not experience the same effects based upon their consumption of essentially the same amount of alcohol as SPC DS and appellant.

Given appellant's testimony that he believed he was drugged on the night of the charged offenses and the forensic expert's testimony regarding the inconsistency between the alcohol consumed and SPC DS's and appellant's loss of memory and behavior, the military judge acknowledged that any doubt he harbored that there was evidence of involuntary intoxication weighed in favor of the accused and he, therefore, provided the panel members the involuntary intoxication instruction.[4]

---

[4] After argument by both parties regarding whether an involuntary intoxication instruction should be given to the panel, the military judge stated:

> When I said in the 802 the evidence was scant, which I did say, my saying that and my concern in this case is whether or not there has been some evidence which would raise the defense of involuntary intoxication, is that there doesn't appear to be any evidence that the accused actually ingested some sort of substance. That is my concern.

> I know he testified he felt as though he was drugged; I know there is other evidence from the expert that perhaps the amount he drank wouldn't cause the effect he claims he experienced, and that is my concern, whether or not there was some evidence of actual ingestion of that substance which is a required element of the defense.

> However, with that said, because I have been struggling with myself and because the law does say that if there is

(continued . . .)

## II. LAW AND DISCUSSION

As discussed herein, we hold that appellant waived his right to challenge the government's failure to collect and analyze his blood for the possible presence of illicit substances. We further hold that the military judge did not err in preventing the defense forensic toxicology expert from testifying about the effects of illicit substances such as GHB, ketamine, and PCP as an explanation for appellant's conduct in support of his involuntary intoxication defense.

### A. Preservation of Appellant's Blood

#### 1. Standard of Review

Before delving into the merits, we must confront at the outset the issue of the appropriate standard of review. Appellant contends that as a result of the government's failure to collect and test his blood, "the only appropriate remedy was to abate the proceedings." However, he offers no particular standard of review. The government, meanwhile, argues this is a question of law reviewed de novo. Both parties miss the mark on this critical threshold issue. *See United States v. Criswell*, 78 M.J. 136, 141 n.5 (C.A.A.F. 2018) ("[C]ounsel can help the Court most if they not only identify the applicable standard of review but also explicitly frame their arguments in terms of the standard of review.").

In the typical case concerning an alleged failure by the government to preserve evidence, the defense makes a motion at trial to continue or abate the proceedings, and appellate courts review a military judge's ruling on that motion for an abuse of discretion. *See, e.g., United States v. Simmermacher*, 74 M.J. 196, 199 (C.A.A.F. 2015); *United States v. Woods*, ARMY 20160465, 2018 CCA LEXIS 433, *5–6 (Army Ct. Crim. App. 28 Aug. 2018) (summ. disp.). "On a motion to abate, the defense bears the burden of persuasion on any factual issue, the resolution of which is necessary to decide the motion." *Woods*, 2018 CCA LEXIS 433 at *6 (citing Rule for Courts-Martial 905(c)(2)(A) [R.C.M.]). This case, however, is not the typical case. Notwithstanding appellant's arguments on appeal, and contention that abatement was the "only appropriate remedy," the record contains no defense motion for abatement, either written or oral. Accordingly, we are unable to review whether the military judge abused his discretion in failing to abate the proceedings for the simple reason that he was never asked to do so. *See United States v. Carpenter*, 77 M.J. 285, 289 (C.A.A.F. 2018) (citations omitted) (noting the review

---

(. . . continued)

           any doubt I should give the instruction, I am going to give the instruction.

for error under the abuse of discretion standard of review "is properly based on a military judge's disposition of the motion submitted to him or her—not the motion that *appellate* defense counsel now wishes *trial* defense counsel had submitted") (emphasis in original).

## 2. Waiver

Unable to review this claim for an abuse of discretion because it was not raised at trial, we must address whether the issue was waived. Whether an appellant has waived an issue is a legal question we review de novo. *United States v. Davis*, 79 M.J. 329, 331 (C.A.A.F. 2020) (citing *United States v. Haynes*, 79 M.J. 17, 19 (C.A.A.F. 2019)). A motion for abatement based on unavailable evidence fundamentally concerns the production of evidence and is therefore governed by R.C.M. 703(f)(2) (2016). It is the type of pretrial motion that "must be raised before a plea is entered." R.C.M. 905(b)(4); *see* R.C.M. 905(b)(4) discussion (cross-referencing R.C.M. 703). Failure to raise this kind of motion prior to the entry of pleas "shall constitute waiver." R.C.M. 905(e)(1).[5] As our superior court reasoned in *United States v. Hardy*, we find the "plain language of R.C.M. 905(b)([4]) and (e) leads to the conclusion" that appellant waived this issue by not raising it before he entered his pleas. 77 M.J. 438, 441 (C.A.A.F. 2018). Having found a valid waiver by operation of law, there is "no error to correct on appeal." *United States v. Ahern*, 76 M.J. 194, 197 (C.A.A.F. 2017) (quoting *United States v. Campos*, 67 M.J 330, 332 (C.A.A.F. 2009)).

Even assuming this issue was not waived by the plain language of R.C.M. 905(b)(4) and (e), we nonetheless conclude appellant affirmatively waived this issue at trial. Waiver is "the intentional relinquishment or abandonment of a known right." *Davis*, 79 M.J. at 331 (quoting *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009)). Here, as appellant notes in his brief, it was clear that the issue of the government's alleged failure to draw and test his blood was known to appellant and the defense counsel well before the entry of pleas. Notwithstanding, appellant entered his pleas and proceeded to trial without seeking abatement based on this alleged error. Furthermore, defense counsel referenced appellant's request that his blood be tested multiple times throughout the case in chief and in argument in support of his involuntary intoxication defense. Defense counsel argued that appellant was smart and would not have requested that his blood be tested if he did not actually believe he was drugged. He also suggested incompetence on behalf of

---

[5] Although tried in 2019, appellant's case was referred to trial on 31 August 2018. As such, the 2016 R.C.M.s apply. *See United States v. Hardy*, 77 M.J. 438, 439 n.2 (C.A.A.F. 2018) (discussing the change in the language of R.C.M. 905(e) for cases referred on or after 1 January 2019).

law enforcement and deceit on the part of a government witness in failing to draw and test appellant's blood. Based on defense counsel's knowledge of the government's alleged failure to collect and test appellant's blood and his tactical use of that issue at trial, we conclude appellant affirmatively waived any claim concerning abatement.[6] To hold otherwise would impermissibly endorse appellant's use of this issue as both a sword at trial and then as a shield on appeal. *See United States v. Lewis*, 69 M.J. 379, 384 (C.A.A.F. 2011) (rejecting appellant's due process argument on appeal based upon the tactical decisions employed at trial).

### 3. Appellant Fails to Establish Plain Error

Assuming appellant merely forfeited this claim at trial, it is his burden to demonstrate "'(1) error that is (2) clear and obvious and (3) results in material prejudice to his substantial rights.'" *United States v. Briggs*, 78 M.J. 289, 295 (C.A.A.F. 2019) (quoting *United States v. Armstrong*, 77 M.J. 465, 469 (C.A.A.F. 2018)). We conclude appellant fails to establish any error, let alone a clear and obvious error. Consequently, we need not address any resulting prejudice. *United States v. Gonzales*, 78 M.J. 480, 487 (C.A.A.F. 2019).

The government has a duty to use good faith and due diligence to preserve and protect: "(1) evidence that has an apparent exculpatory value and that has no comparable substitute," "(2) evidence that is of such central importance to the defense that it is essential to a fair trial," and "(3) statements of witnesses testifying at trial." *United States v. Stellato*, 74 M.J. 473, 483 (C.A.A.F. 2015) (citations omitted). Unlike evidence of an apparent exculpatory value, the failure to preserve "potentially useful evidence" is only a violation of due process if there is a showing of bad faith by law enforcement. *Simmermacher*, 74 M.J. at 199 (citing *Arizona v.*

---

[6] We note that during oral argument in this case, held on 22 October 2020, appellate defense counsel acknowledged that appellant waived his right to challenge the government's failure to collect and analyze his blood for the possible presence of illicit substances. Although not briefed to this court or personally asserted by appellant pursuant to *Grostefon*, appellate defense counsel at oral argument invited this court to consider whether appellant's trial defense counsel provided ineffective assistance of counsel for failing to file a motion to abate. Having reviewed the entire record of trial under our Article 66, UCMJ, mandate, we conclude appellant "had counsel who, by his . . . representation, made the adversarial proceedings work." *United States v. Murphy*, 50 M.J. 4, 8 (C.A.A.F. 1998) (citing *United States v. Dicupe*, 21 M.J. 440 (C.M.A. 1986)); *see United States v. Green*, 68 M.J. 360, 361–62 (C.A.A.F. 2010) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)) (placing the burden on an appellant to demonstrate both deficient performance and prejudice).

*Youngblood*, 488 U.S. 51, 58 (1988)); *see Illinois v. Fisher*, 540 U.S. 544, 547–49 (2004) (reinforcing the holding of *Youngblood*). There is no due process requirement that the government use any particular investigatory tool, including quantitative testing, to secure exculpatory evidence. *Youngblood*, 488 U.S. at 58–59.

In this case, the government did not actually lose, destroy, or fail to preserve a piece of existing or collected evidence. Rather, appellant alleges his due process rights were violated by the government's failure to collect a sample of his blood and make it available for a toxicological analysis. As a sample of appellant's blood was never in the government's possession, and any exculpatory value it might have possessed is speculative, we reject appellant's argument that his claim should be analyzed under *Brady v. Maryland*, 373 U.S. 83 (1963). *See Fisher*, 540 U.S. at 547 (noting a due process violation under *Brady* occurs when the government suppresses or fails to disclose material exculpatory evidence irrespective of good or bad faith). Assuming appellant's blood would have provided "potentially useful evidence" to the defense, we conclude appellant's constitutional due process challenge, at most, falls within the ambit of *Youngblood*. As such, appellant is required to demonstrate bad faith on the part of law enforcement. *Simmermacher*, 74 M.J. at 199.

Here, appellant claims bad faith on the part of the SANE who conducted his SAFE and law enforcement who were present during the exam. Having reviewed the record, we find no bad faith on the part of any government actor. *See Youngblood*, 488 U.S. at 58 (describing an example of bad faith in which the "police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant").

Even assuming appellant requested that the SANE take a sample of his blood, we find no bad faith in her response wherein she conveyed to appellant that she could not do it but that he could come back to the hospital as a patient and have his blood drawn, or words to that effect. We find no evidence that the SANE, by her conduct, was intentionally suppressing or preventing the discovery of potentially useful evidence. Even if she erred in not drawing appellant's blood herself, there is no evidence that she, for example, told appellant he was not entitled to that procedure because he was a criminal suspect. That appellant did not seek alternative collection and testing of his blood is not attributable to any bad faith on the part of the SANE.

We likewise find no bad faith on the part of law enforcement. While appellant claims the "proper procedure would have been for law enforcement to amend the search and seizure authorization to include a toxicology screening," he cites no authority for this proposition. While it may have been appropriate for law enforcement to do so, the failure of the agents to alter their investigative strategy

based upon an accused's requests hardly constitutes bad faith. *See Youngblood*, 488 U.S. at 58–59.

Finally, appellant emphasizes the centrality of this evidence, claiming his blood sample "was his innocence." To the extent appellant suggests this should somehow elevate the due process analysis, we note the Supreme Court squarely confronted and rejected this claim. *See Fisher*, 540 U.S. at 549 (quoting *Youngblood*, 488 U.S. at 57–58) ("[T]he applicability of the bad-faith requirement in *Youngblood* depended not on the centrality of the contested evidence to the prosecution's case or the defendant's defense, but on the distinction between 'material exculpatory' evidence and 'potentially useful' evidence.").

In conclusion, we find appellant has failed to establish a clear and obvious error in this case concerning the government's failure to collect and test his blood. Even assuming this evidence was potentially useful, appellant fails to establish any bad faith on the part of any government actors. As such, his due process claim fails.[7]

### B. Limitation of Defense's Expert Testimony

Appellant's second assignment of error alleges the military judge abused his discretion by precluding the defense expert from providing testimony about how certain drugs might have impacted appellant's actions on the night in question. We disagree.

We review a military judge's decision to exclude evidence for an abuse of discretion. *Kohlbek*, 78 M.J. at 333 (citing *United States v. Jasper*, 72 M.J. 276, 279 (C.A.A.F. 2013)). A military judge abuses his discretion "when his findings of fact are clearly erroneous, the court's decision is influenced by an erroneous view of the law, or the military judge's decision on the issue at hand is outside the range of

---

[7] Appellant asserts a constitutional due process challenge and not a procedural challenge based upon R.C.M. 703(f)(2). *See Simmermacher*, 74 M.J. at 199–202 (discussing the distinction between due process challenges and challenges brought under R.C.M. 703(f)(2)). Even assuming appellant was making an argument under R.C.M. 703(f)(2), we would reject it because he fails on prongs one and three. Specifically, he fails to establish how the speculative blood evidence "was of such central importance that it was essential to a fair trial." *Id.* at 201. Additionally, given that he was free to submit to a test himself at any time before or after his examination with the SANE, he fails to establish why the alleged loss of the evidence was not his fault or, alternatively, why he could not have prevented its loss through his own actions. *Id.* at 202.

choices reasonably arising from the applicable facts and law." *United States v. Miller*, 66 M.J. 306, 307 (C.A.A.F. 2008) (citations omitted).

### 1. *The military judge did not abuse his discretion*

Defense counsel sought to have a forensic toxicology expert testify about the possible effects that certain drugs, such as GHB, ketamine, and PCP, might have had on appellant's actions on the night of the charged offenses. While the military judge allowed the defense expert to testify about the effects of alcohol on appellant, he did not allow the presentation of expert testimony regarding any other drugs. He did so because while there was evidence presented during trial concerning appellant's alcohol use on the night of the charged offenses, there was no evidence presented concerning appellant's use of any other substance, including GHB, ketamine, or PCP. Defense counsel argued in an Article 39(a), UCMJ, session that the expert was prepared to testify about how use of those substances "potentially" could have explained appellant's behavior. Critically, though, defense counsel did not connect any of those substances to appellant (or anyone else), and the arguments of counsel in support of an evidentiary issue are not evidence. *See United States v. Facey*, 26 M.J. 421, 425 (C.M.A. 1988); *United States v. Watson*, 14 M.J. 593, 594 (A.F.C.M.R. 1982). We conclude the military judge was well within his discretion not to allow an expert witness to hypothesize about the effects of various drugs when there was no evidence that appellant or anyone else ingested them and no evidence that such drugs were readily available in the local area. *Cf. United States v. Gaither*, ARMY 20160287, 2018 CCA LEXIS 432 (Army Ct. Crim. App. 27 Aug. 2018) (summ. disp.).

We also find no incongruity in the military judge's decision to charge the panel with an involuntary intoxication instruction, notwithstanding his decision to preclude the defense expert from testifying about the effects of certain drugs. Military judges are obliged to provide instructions on all affirmative defenses reasonably raised by the evidence. *United States v. MacDonald*, 73 M.J. 426, 434 (C.A.A.F. 2014). "A defense is reasonably raised when 'some evidence, without regard to its source or credibility, has been admitted upon which members might rely if they choose.'" *Id.* (quoting *United States v. Stanley*, 71 M.J. 60, 61 (C.A.A.F. 2002)).

Here, while the military judge acknowledged it was a close call, he ultimately concluded there was "some evidence" that appellant might have involuntarily ingested intoxicants. Specifically, there was evidence adduced at trial that appellant told people he felt as if he had been drugged. We find the military judge's decision was squarely in line with precedent from our superior court, which states "[a]ny doubt regarding whether an affirmative defense instruction is in order should be resolved in favor of the accused." *Id.* (citing *United States v. Davis*, 53 M.J. 202, 205 (C.A.A.F. 2000)).

### 2. *Even if the military judge erred, appellant suffered no prejudice*

The "findings or sentence of a court-martial may not be held incorrect on the ground of an error of law unless the error materially prejudices the substantial rights of the accused." UCMJ art. 59(a). For nonconstitutional evidentiary errors, the test for prejudice "is whether the error had a substantial influence on the findings." *Kohlbek*, 78 M.J. at 334 (quoting *United States v. Fetrow*, 76 M.J. 181, 187 (C.A.A.F. 2017)).[8] We review de novo the prejudice resulting from an erroneous evidentiary ruling and do so by considering: (1) the strength of the government's case; (2) the strength of the defense case; (3) the materiality of the evidence in question; and (4) the quality of the evidence in question. *Id.*

We find the government's case was strong. Specialist DS testified that appellant was his supervisor at the time of the charged offenses. Ms. Lipp and Ms. Foley's testimony was credible and consistent regarding their observations of appellant anally penetrating an unresponsive SPC DS and masturbating over him, in a public forum. Both women, along with MSgt Cook, testified SPC DS had to be assisted into consciousness, was slurring his words, vomited upon waking, and appeared intoxicated. Ms. Lipp, MSgt Cook, and SPC Johnson all testified that appellant was responsive to their verbal communications with him despite his exhibiting signs of intoxication. Specialist DS also testified he was very intoxicated that night and could not recall any events from approximately midnight to 0330 during the time of the charged offenses and "awoke" surrounded by strangers with pain in his buttocks area. An expert in forensic biology testified that appellant's DNA was located in the "rear crotch area" of SPC DS's boxer shorts.

On the other hand, the defense case was weak regarding the offenses of which appellant was convicted, specifically maltreatment and indecent conduct. While appellant's evidence of heterosexuality and challenge of evidence of actual penetration resulted in his acquittal of the sexual assault and sodomy offenses, evidence of involuntary intoxication for the offenses of maltreatment and indecent conduct was minimal at best. The only evidence of involuntary intoxication was

---

[8] We reject appellant's claim that this alleged error is constitutional in nature and should therefore be tested for harmlessness beyond a reasonable doubt. Appellant's reliance on *MacDonald* for this proposition is misplaced. In *MacDonald*, the military judge failed to provide a required instruction on involuntary intoxication, and the failure to instruct implicated the appellant's constitutional rights. 73 M.J. at 434. As discussed above, no such issue exists in the present case because the military judge provided an involuntary intoxication instruction. Appellant's alleged error—that he did not get to fortify this defense with his desired expert testimony—does not raise the constitutional concerns addressed in *MacDonald*.

appellant's testimony that he did not experience a typical hangover the next day and that he could not recall a portion of the evening. Based upon those facts, appellant testified that he believed he had been drugged. Specialist DS testified that the last drink he recalled consuming at the bar that night tasted "funny." However, neither appellant nor the other two soldiers testified about any of their drinks at the bar tasting strange. There was no toxicology evidence of substances in appellant's system and no evidence that anyone had slipped something into his drink at the bar that night. When asked whether his cigarettes may have been tampered with, appellant himself testified that he did not leave his cigarettes unattended at the bar. There was also no evidence of the availability of drugs such as GHB, ketamine, or PCP on the island of Guam. Given the evidence presented at trial, we do not find expert testimony concerning the effects of other drugs such as GHB, ketamine, and PCP material to appellant's presentation of a defense of involuntary intoxication.

We further conclude that the materiality and quality of the excluded evidence was low. "In examining these factors, we essentially are assessing how much the erroneously [excluded] evidence may have affected the court-martial." *United States v. Washington*, 80 M.J. 106, 111 (C.A.A.F. 2020). Given there was no evidence that appellant or anyone else ingested illicit substances, an expert's testimony hypothesizing about the effects of such drugs would have confused rather than assisted the members in their fact-finding responsibilities. As such, the exclusion of the evidence in this case had no meaningful effect on appellant's court-martial.

Based on the foregoing, the government has met its burden to show that even if the military judge erred, the error did not have a substantial influence on the findings.

## CONCLUSION

Upon consideration of the entire record, the findings of guilty and the sentence as approved by the convening authority are AFFIRMED.

Senior Judge ALDYKIEWICZ and Judge SALUSSOLIA concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

14

# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
ALDYKIEWICZ, SALUSSOLIA, and WALKER
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Sergeant MICHAEL A. HORNER**
**United States Army, Appellant**

ARMY 20190249

---

NOTICE OF COURT-MARTIAL ORDER CORRECTION

---

IT IS ORDERED THAT, to reflect the true proceedings at the trial of the above-captioned case,

COURT-MARTIAL ORDER NUMBER 8, HEADQUARTERS, 8TH THEATER SUSTAINMENT COMMAND, FORT SHAFTER, HAWAII 96858, dated 22 July 2019,

IS CORRECTED AS FOLLOWS:

BY deleting at the top of page one, the words and figures "Sex Offender Registration required. 42 U.S.C. 1565."

DATE: 13 November 2020

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court